STATE of Tennessee, Appellee,

v.

James Lee TURNBILL, Appellant.

Court of Criminal Appeals of Tennessee, at Knoxville.

June 4, 1982.

Permission to Appeal Denied by Supreme Court Sept. 13, 1982.

Kenneth A. Miller, Knoxville, for appellant.

William M. Leech, Jr., Atty. Gen., J. Andrew Hoyal, II, Asst. Atty. Gen., Nashville, Ronald A. Webster, Dist. Atty. Gen., William H. Crabtree, Raymond A. Shirley, Asst. Dist. Attys. Gen., Knoxville, for appellee.

## OPINION

SCOTT, Judge.

The appellant was convicted of murder in the first degree and received a sentence of

life imprisonment. On appeal the appellant has presented eight issues. In the first he contends that his constitutional right to a speedy trial was violated.

The appellant was arrested on March 15, 1980, and charged with murder in the first degree. The indictment was returned by the grand jury on June 26, 1980. The appellant first moved for a speedy trial on August 4, 1980. The trial was originally set for December 15, 1980, before Honorable Joseph J. Nigro. The case could not be tried at that time so it was continued until January 9, 1981.

Judge Nigro retired on December 31, 1980. *Tennessee State Judges Directory*, p. 61. The matter was placed on the motion docket for January 9, 1981, before his successor, Honorable John J. Duncan, Jr. The record reveals no hearing on that date. The desire for a speedy trial was reiterated in another motion filed January 12, 1981. A motion to suppress was heard on February 20 and 23, 1981. Judge Duncan acted on the motions for a speedy trial on March 6, 1981, and offered to set the trial for March 9, 1981. The appellant declined this offer. The trial judge then suggested March 17, 1981, and the appellant again declined to have the case set on that date. Finally, the case was scheduled for March 30, 1981, but could not be tried that day, due to some witness' conflict with the FBI School. The state moved for a continuance. It was finally reset for April 7, 1981, and the trial actually began that day.

Thus, almost thirteen months elapsed between the date of the appellant's arrest and the date the trial began. The record also reveals that the appellant filed numerous motions, some of which, by their nature, required a delay. On July 16, 1980, the appellant filed a motion for a psychiatric evaluation. This motion was granted on October 15, 1980, and the evaluation took place. In addition, the appellant sought a change of venue, a dismissal of the indictment, a reduction of his bond, discovery of various documents, the production of a witness, and the suppression of evidence. These motions were heard on September 26,

1980, December 15, 1980, February 20 and 23, 1981, and March 6, 1981.

■ In determining whether an individual has been denied his constitutional right to a speedy trial, courts must look to four factors which are to be weighed in the balance. The factors include, (1) the length of the delay, (2) the reason for the delay, (3) the accused's assertion of his right to a speedy trial, and (4) prejudice to the accused resulting from the delay. *Barker v. Wingo*, 407 U.S. 514, 530, 92 S.Ct. 2182, 2192, 33 L.Ed.2d 101 (1972), *State v. Bishop*, 493 S.W.2d 81, 84 (Tenn.1973).

■ The length of the delay is to some extent a triggering mechanism. Until there is some delay which is presumptively prejudice, it is unnecessary to inquire into the other factors. *Barker v. Wingo*, supra. The thirteen months delay in this case is presumptively prejudicial.

TCA § 40–2503(a) provides:

Except as otherwise provided by this section, any charge of a Class X felony shall be tried within one hundred and fifty (150) days following arraignment unless delay is occasioned by the defendant, by an examination for competency ordered pursuant to § 33–708, by a competency hearing, by an adjudication of incompetency for trial, by a continuance allowed after a court's determination of the defendant's physical incapacity for trial, or by an interlocutory appeal.

Murder in the first degree is a Class X felony. TCA § 39–5402(1).

Failure to comply with TCA § 40–2503(a) does not require release of a defendant from custody or dismissal of charges. TCA § 40–2503(e).

■ Although the appellant requested a psychiatric evaluation, that request was not the cause of the non-compliance with the 150 days requirement of TCA § 40–2503(a). The appellant was arraigned on July 2, 1980, and the trial was set that day for December 15, 1980, the 166th day after arraignment. The appellant's request for the psychiatric examination was not filed

until July 16. Therefore, his request in no way caused the original failure to comply with the statute. In view of this noncompliance, and the additional delays resulting therefrom, it is necessary to examine the other factors set forth in *Barker.*

The reason for the delay should not be weighed heavily against the state. In evaluating this factor the Supreme Court provided the following guidance in *Barker v. Wingo:*

> A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government. A more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant. Finally, a valid reason, such as a missing witness, should serve to justify appropriate delay. 407 U.S. at 531, 92 S.Ct. at 2192.

According to the record, the delay chargeable to the government in this case resulted from the retirement of the judge who presided over the court to which the case was assigned, the subsequent appointment of his successor, the usual overcrowded docket, and somebody's attendance at an FBI School. All of these are either valid or neutral reasons for delay. Part of the delay is attributable to the conscientious advocacy of the defense counsel who filed a number of motions in behalf of his client. A number of these motions required a hearing before the trial judge could intelligently act upon them. In addition, the period from March 9 through March 30 is chargeable entirely to the appellant who rejected various trial dates suggested by the trial judge.

The third factor, the appellant's assertion of his right, also weighs in his favor. The appellant first requested a speedy trial on August 4, 1980, and persisted on that request until the trial.

No single factor is determinative in all cases, but the most crucial inquiry is whether the delay has prejudiced the defendant.

*Tillery v. State,* 565 S.W.2d 509, 510 (Tenn. Cr.App.1978, citing *United States v. Reynolds,* 489 F.2d 4 (6th Cir. 1973), *Trigg v. State of Tennessee,* 507 F.2d 949 (6th Cir. 1974). The appellant contends that he was prejudiced due to the disappearance of a number of witnesses who would have testified for him. However, he has provided evidence of only one witness who may have been present had an earlier trial date been set.

Deloris Gann would, according to the appellant, have testified that she did not coerce or intimidate the key eyewitness to tell the defense counsel that the appellant struck the deceased in self-defense. Ms. Gann could not be located because she went to Georgia following the death of her mother.

However, the appellant was, at least to some degree, responsible for the failure of Ms. Gann to appear at trial. Even though he knew how to contact Ms. Gann, he refused to reveal how he was able to reach her. He was getting messages to Ms. Gann through "another party". But, when the trial judge tried to get him to reveal who this "other party" was, he adamantly refused to do so.

The appellant's attorney filed an affidavit indicating that he requested the issuance of a subpoena for Ms. Gann on February 6, 1981, but the Criminal Court Clerk's Office held the request until about ten days before trial. He contended that had the subpoena been timely issued, Ms. Gann would have been available for service in Knoxville. However, there is no proof as to when Ms. Gann departed for Georgia, or proof that she could have been found had the process server had the subpoena in his hands on February 6.

The appellant also failed to prove that the absence of Ms. Gann was prejudicial to his case or that she would have been available had the subpoena been issued at an earlier time. The appellant has wholly failed to prove any prejudice from the delay in bringing him to trial. This issue has no merit.

A recitation of the facts will bring the remaining issues into focus.

On November 30, 1979, the appellant and Marvin Stinnett were arrested for the strong-armed robbery of James Pollard. The appellant entered a guilty plea to the offense of criminal trespass on February 22, 1980, and received a sentence of eleven months and twenty-nine days at the Knox County Penal Farm. He was given credit for time in jail from December 1, 1979, and was released on March 7, 1980.

Amazingly, Mr. Pollard took the appellant in after he was released from jail. Mr. Pollard allowed the appellant and his girlfriend, Marnie Kim Headrick, to share his one room sleeping quarters at Volunteer Helpers, Inc., a rescue mission at 103½ South Gay Street in Knoxville. Apparently the appellant, Ms. Headrick, and Mr. Pollard occupied this room which contained only a single bed, a sink, and some cabinets, and measured 8 feet × 12 feet or less. The management of the mission was unaware of their presence in Mr. Pollard's room.

On March 14, 1980, Gene Schmidt, director of the mission, and manager of the apartments operated by the mission, knocked on the door of an apartment across and down the hall from Mr. Pollard's room. Ms. Headrick stuck her head out the door and Mr. Schmidt directed her and the appellant to leave. Mr. Schmidt sought the assistance of officers from the Knoxville Police Department in order to throw the intruders out of Mr. Pollard's room. Mr. Pollard was not present during any of these activities.

The appellant and Ms. Headrick walked a short way down Gay Street and were sitting in the doorway at 117½ South Gay Street when Mr. Pollard came walking by. Mr. Pollard had a bag containing beer, MD 20/20, and Ten High Whiskey. The appellant asked Ms. Headrick who was coming down the street. She responded that it was Mr. Pollard, and the appellant said, "Now's my chance".

Mr. Pollard stopped, gave the bag to the appellant, and conversed with the appellant and Ms. Headrick, asking why they were out of the apartment. The appellant responded, "You snitched on us", apparently referring to their being forcefully removed from his apartment. Mr. Pollard responded that he did not "snitch" on them. Some discussion followed as to whether the appellant would sell the services of Ms. Headrick for prostitution, to which the appellant responded that he would not. The conversation then returned to the subject of whether Mr. Pollard had "snitched" on the appellant.

The appellant grabbed Mr. Pollard and hit him in the face with his fist. Mr. Pollard fell to the floor and put his arms over his face to keep the appellant from hitting him. However, the appellant continued to hit him with his fist. The appellant also kicked him in the head and side and "stomped" him in the face. Mr. Pollard never hit the appellant except to attempt to ward off the punches. According to Ms. Headrick, this beating lasted for twenty-five to thirty minutes. When it was over the appellant told her to get Mr. Pollard's bag of liquor, and they walked to the 205 Club for the appellant to wash his hands. However, he was unable to do so because the manager of the club refused them admission. They walked back toward the mission and observed police officers at the scene of the beating. The appellant and Ms. Headrick sat down on some steps behind the mission for five to ten minutes, and then re-entered the rescue mission via a fire escape. Ms. Headrick climbed in Mr. Pollard's apartment window; the appellant entered through the fire escape door and she let him in through the apartment door. Ms. Headrick washed Mr. Pollard's blood from the appellant's hands and removed his shirt, shoes, and jacket. Her shoes and blue jeans were also bloody. They then went to bed.

Mr. Pollard was taken to the University of Tennessee Hospital in a semiconscious state. He had abrasions and contusions on his head, and a cut on his nose which was bleeding quite badly. Abrasions on the left side of his face had the imprint of the tread of a tennis shoe.

John Cochran, a detective with the Knoxville Police Department, was called to the hospital to investigate. Since Mr. Pollard's identification revealed that he resided at the rescue mission, Mr. Cochran went to the mission to attempt to obtain some clues to begin his investigation. Mr. Schmidt and a helper used a tire tool or a large screwdriver to open the door to Mr. Pollard's room. When Mr. Cochran entered, he saw the appellant and Ms. Headrick in bed and their bloody shoes sitting beside the bed. They were taken into custody, and the appellant gave a statement admitting having a fight with Mr. Pollard. The blood on the appellant's shoes, Ms. Headrick's shoes, and Ms. Headrick's blue jeans, like Mr. Pollard's, was Type A.

Mr. Pollard died from the traumatic injuries to his head shortly before 7:00 A.M. the following morning.

In the next issue the appellant questions whether he had a legitimate expectation of privacy in the apartment where he was living, and whether the officers properly entered the room without a search warrant.

In *Jones v. United States,* 362 U.S. 257, 259, 80 S.Ct. 725, 730, 4 L.Ed.2d 697 (1960), the defendant occupied an apartment belonging to a friend who had been away for about five days. The friend had given him the use of the apartment and a key with which Jones admitted himself on the date of his arrest. He had a suit and shirt which he kept at the apartment, but his home was elsewhere. He paid nothing for the use of the apartment and his friend let him use it "as a friend". The Supreme Court held that Jones had standing to challenge the search. However, his standing was predicated upon an "automatic standing" rule which allowed an individual charged with a possessory crime to automatically challenge any search which led to the discovery of the contraband.

In *Katz v. United States,* 389 U.S. 347, 353, 88 S.Ct. 507, 512, 19 L.Ed.2d 576 (1967), the Supreme Court held that capacity to claim Fourth Amendment protection depends upon whether the person claiming the right has a "legitimate expectation of privacy" in the invaded place.

Later, the automatic standing rule set forth in *Jones* was severely limited in *Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). In *Rakas,* the Court stated the crucial question is "whether the challenged search and seizure violated the Fourth Amendment rights of a criminal defendant who seeks to exclude the evidence obtained during it". That inquiry in turn requires a determination of whether the disputed search and seizure has infringed an interest of the defendant which the Fourth Amendment was designed to protect. *Id.,* 439 U.S. at 140, 99 S.Ct. at 429.

The Court stated concerning *Jones* that, "We think that *Jones* on its facts merely stands for the unremarkable proposition that a person can have a legally sufficient interest in a place other than his own home, so that the Fourth Amendment protects him from unreasonable governmental intrusion into that place". *Id.,* 439 U.S. at 142, 99 S.Ct. at 430.

The automatic standing rule enunciated in *Jones* was later expressly overruled in *United States v. Salvucci,* 448 U.S. 83, 85, 100 S.Ct. 2547, 2549, 65 L.Ed.2d 619 (1980). However, in *Salvucci,* the Court did not question the statement in *Rakas* that "Katz and Jones could legitimately expect privacy in the areas which were the subject (sic) of the search (sic) and seizure (sic) they sought to contest". *Rakas v. Illinois,* supra, 439 U.S. at 149, 99 S.Ct. at 433. Thus, the United States Supreme Court has recognized that even under the tougher "legitimate expectation of privacy" standard that an individual may have such a legitimate expectation of privacy in another person's residence.

█ The next question then becomes one of whether the appellant in this case had such a legitimate expectation of privacy in the victim's apartment. The trial judge found no such expectation, because the appellant had "been ordered to leave this room, for which he paid no rent, and which was a one person room". A trial judge's findings of fact on a motion to suppress are

conclusive on appeal unless the reviewing court finds that the evidence preponderates against the lower court's judgment. *State v. Tate,* 615 S.W.2d 161, 162 (Tenn.Cr.App. 1981).

In *United States v. Haydel,* 649 F.2d 1152, 1154–1155 (5th Cir. 1981), the United States Court of Appeals for the Fifth Circuit teaches us that "(n)o one circumstance is talismanic to the *Rakas* inquiry". The Court, citing *United States v. Salvucci,* supra, *Rawlings v. Kentucky,* 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980), and *Rakas v. Illinois,* supra, then listed seven factors to be considered in determining whether an individual's Fourth Amendment rights have been violated. These factors include: (1) property ownership; (2) whether the defendant has a possessory interest in the thing seized; (3) whether the defendant has a possessory interest in the place searched; (4) whether he has the right to exclude others from that place; (5) whether he has exhibited a subjective expectation that the place would remain free from governmental invasion; (6) whether he took normal precautions to maintain his privacy; and (7) whether he was legitimately on the premises.

▮ Applying these factors to this case, we find that the appellant had neither an ownership interest nor possessory interest in the room at the mission. Hence, he had no right to exclude others from that place. He was not legally on the premises, for only a short time earlier he had been forcefully removed by the mission director and the police. The appellant had an ownership interest and a possessory interest in his shoes. He took normal precautions to maintain his privacy by locking the door, and this locking was an exhibition of a subjective expectation that the room would remain free from governmental invasion.

Weighing the *Haydel* factors, "in light of all the surrounding circumstances", *Rakas v. Illinois,* supra, 439 U.S. at 152, 99 S.Ct. at 435 (Powell, J., concurring), the appellant did not have a legitimate expectation of privacy in the victim's sleeping room at the time of the police intrusion. While he per-

haps had a subjective expectation, it was not legitimate. Hence, he cannot contest the search and seizure. This issue has no merit.

Next the appellant questions whether the state can introduce evidence that the defendant has committed a prior felony when a final judgment agreed to by the state has acquitted the defendant of the felony. In this issue the appellant is referring to the fact that there was testimony concerning the fact that the appellant was previously arrested for the strong-armed robbery of the victim, and that he entered a guilty plea to the offense of criminal trespass.

▮ Generally, in a criminal trial, evidence that the defendant has committed some other crime wholly independent of that with which he is charged, even though it is a crime of the same character, is usually inadmissible *because it is irrelevant.* (emphasis in original). *Bunch v. State,* 605 S.W.2d 227, 229 (Tenn.1980). However, if evidence that the defendant has committed a crime separate and distinct from the one on trial *is relevant* to some matter actually in issue in the case on trial and if its probative value as evidence of such matter in issue is not outweighed by its prejudicial effect on the defendant, then such evidence may be admitted. *Id.* Evidence of other crimes is admissible to show intent and motive. *Id., State v. Jones,* 623 S.W.2d 129, 131 (Tenn.Cr.App.1981). The relations existing between the defendant and the victim of a crime of violence are relevant. *State v. Glebock,* 616 S.W.2d 897, 905–906 (Tenn.Cr.App.1981).

Before allowing evidence of the prior criminal episode to be introduced, the trial judge conducted a jury-out hearing where he balanced the prejudicial effect against the probative value. The trial judge allowed the testimony for three reasons, (1) the relationship between the defendant and the victim; (2) the closeness in time of the two incidents; and (3) as proof of the appellant's intent.

▮ The appellant maintains that the proof of the prior episode should not be

admitted because he was acquitted of that offense. *State v. Holman,* 611 S.W.2d 411, 413 (Tenn.1981). Conviction of a lesser included offense operates as an acquittal on the greater charge. *Mullreed v. Kropp,* 425 F.2d 1095, 1102 (6th Cir. 1970). A guilty plea is a conviction. *Bratton v. State,* 477 S.W.2d 754, 757 (Tenn.Cr.App.1971). Thus, the appellant claims that his guilty plea to the offense of criminal trespass was an acquittal on the charge of robbery. He properly contends that criminal trespass is not a lesser included offense of robbery, since robbery does not include the elements of criminal trespass.

▇▇▇ In this case, as in *Glebock,* the prior relations between the victim and the appellant were relevant matters for the jury's consideration on the question of the appellant's intent. Even though not actually convicted of the robbery, the appellant was convicted of a crime against the appellant. The circumstances of that crime were also relevant to the issue of the appellant's intent. The admission of this testimony was not error and this issue has no merit.

▇▇▇ Next the appellant questions whether the juvenile record of the eyewitness was a proper subject for cross-examination. He contends that he was erroneously prohibited from cross-examining Ms. Headrick about her juvenile record. At trial she testified before the jury that she had never been arrested. However, at a jury-out hearing she admitted that she had been arrested and institutionalized at the Highland Rim School for Girls at Tullahoma, because she was a runaway. The appellant sought to introduce the evidence of this incarceration as evidence of her untruthfulness. The trial judge refused, citing TCA § 37–233(b) as his authority. This section of our code provides:

> The disposition of a child and evidence adduced in a hearing in juvenile court may not be used against him in any proceeding in any court other than a juvenile court, whether before or after reaching majority, except in dispositional proceedings after conviction of a felony for the purposes of a pre-sentence investigation and report.

In *Davis v. Alaska,* 415 U.S. 308, 319, 94 S.Ct. 1105, 1112, 39 L.Ed.2d 347 (1974), the United States Supreme Court held that when the defendant seeks to show the bias or prejudice of a witness, the right of confrontation is paramount to the state's policy of protecting a juvenile offender. In *State v. Butler,* 626 S.W.2d 6, 10 (Tenn.1981), the Tennessee Supreme Court adopted Rule 609(d), *Federal Rules of Evidence.* This rule provides:

> Evidence of juvenile adjudications is generally not admissible under this Rule. The Court may, however, allow evidence of a juvenile adjudication of a witness other than the accused if conviction of the offense would be admissible to attack the credibility of an adult and the court is satisfied that admission of the evidence is necessary for a fair determination of the issue of guilt or innocence.

The juvenile record which the appellant sought to introduce fails both tests set forth in the rule. First, a conviction of the offense would not be admissible to attack the credibility of an adult, because running away from home is not, in and of itself, a criminal offense when the runner is an adult. In addition, admission of the evidence is unnecessary for a fair determination of the issue of guilt or innocence. The prior juvenile adjudication was tendered, as was the adjudication in *Butler,* to impeach the general credibility of the witness, not to show bias or prejudice. *Id.,* at 11. Therefore, the evidence was not admissible. The trial judge did not err in excluding this proof. This issue has no merit.

In the next issue the appellant questions whether the state is bound by its pleadings. The state filed a motion for notice of alibi pursuant to Rule 12.1(a), T.R.Cr.P. In the notice, the offense was alleged to have occurred on "March 14–March 15, 1980 at approximately between 11:30 and 12:30 a.m.". The proof indicated that the crime actually occurred a short time before 9:25 P.M. on March 14. Hence, the appellant contends that there was a fatal variance between the motion and the proof.

A variance between a pleading and the proof in a criminal case is not material where the variance is not of a character which would have misled a defendant at the trial. *Johnson v. State,* 596 S.W.2d 97, 103 (Tenn.Cr.App.1979), citing *Brown v. State,* 186 Tenn. 378, 210 S.W.2d 670, 675 (1948). The appellant has not established that this variance misled him in any way at trial. In fact, the defense of alibi was not presented. Therefore, the issue is moot. *Johnson v. State,* supra, at 102, fn. 5.

In the next issue the appellant questions whether the state can introduce a photograph of the appellant in its case in chief without informing him about the photograph, pursuant to Rule 16, T.R.Cr.P. The appellant filed a discovery motion under Rule 16(a)(1)(C), T.R.Cr.P. The state's failure to comply with the request was error, but was harmless. Rule 52(a), T.R. Cr.P.

The appellant contends that the photograph is prejudicial as it depicts him as a "North Gay Street bum". The photograph portrays the appellant in an unkempt condition, but is not inconsistent with the appearance that one would expect from an individual rousted from his bed in the middle of the night. Whether he was in fact a "bum", there is no doubt that he was residing at the rescue mission on *South* Gay Street. This issue has no merit.

In the next issue the appellant questions whether a defendant must waive his Fifth Amendment rights before he can receive a hearing to determine the admissibility of prior convictions. He complains that the trial judge refused to hold a hearing of the type mandated by *State v. Morgan,* 541 S.W.2d 385 (Tenn.1976), prior to his taking the stand to testify.

In *Houston v. State,* 567 S.W.2d 485, 488 (Tenn.Cr.App.1978), this Court found no error in a similar trial procedure. In *Long v. State,* 607 S.W.2d 482, 486 (Tenn.Cr.App. 1980), this Court noted that a defendant is not entitled to a blanket prohibition against the introduction of evidence of his prior convictions as requested in a motion in limine, in order for him to decide whether or not he will testify.

One federal court, interpreting Rule 609(a) of the *Federal Rules of Evidence,* has agreed that the decision whether to rule in advance on the admissibility of a defendant's prior convictions is a matter committed to the discretion of the trial judge. *United States v. Tercero,* 640 F.2d 190, 196 (9th Cir. 1980).

There was no error in the trial judge's refusal to rule on this issue in advance of the appellant's taking the stand. This issue has no merit.

Finally, the appellant questions whether the evidence is sufficient to support his conviction.

A jury verdict of guilty, approved by the trial judge, accredits the testimony of the state's witnesses and resolves all conflicts in favor of the theory of the state. *State v. Hatchett,* 560 S.W.2d 627, 630 (Tenn.1978). On appeal the state is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences which may be drawn therefrom. *State v. Cabbage,* 571 S.W.2d 832, 835 (Tenn.1978).

The proof in this case revealed that the appellant was apparently disgruntled because he and his girlfriend were kicked out of the rescue mission. He blamed the victim, believing that Mr. Pollard had "snitched" on him. There was apparently some bad blood between the appellant and the victim growing out of the appellant's prior robbery of the victim, and his conviction and incarceration growing out of that offense. Yet, the victim had befriended the appellant in the days just preceding the murder.

To find one guilty of murder in the first degree in these circumstances, the state must prove that the accused killed the victim, and that the killing was willful, deliberate, malicious, and premeditated. TCA § 39–2402(1), T.P.I.—Crim. § 20.01. Premeditation can be established by the repeated infliction of blows upon the victim.

*Houston v. State,* 593 S.W.2d 267, 273 (Tenn.1980). Here, the appellant "stomped" the victim in the head repeatedly after the victim was rendered helpless.

There was ample, indeed overwhelming, evidence from which a rational trier of fact could determine that the appellant was guilty of murder in the first degree beyond a reasonable doubt. Rule 13(e), T.R.A.P., *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 2786–2792, 61 L.Ed.2d 560 (1979). This issue has no merit.

Finding all of the issues presented by the appellant devoid of merit, the judgment is affirmed.

CORNELIUS, J., and JOHN D. TEMPLETON, Special Judge, concur.