# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### May 8, 2001 Session

## STATE OF TENNESSEE v. CORWYN E. WINFIELD

**Direct Appeal from the Criminal Court for Shelby County**
**No. 98-08227     Bernie Weinman, Judge**

---

**No. W2000-00660-CCA-R3-CD  - Filed July 11, 2001**

---

The defendant was convicted of second degree murder by a Shelby County jury in the shooting death of his girlfriend.  He was sentenced to twenty years as a standard offender, with his sentence to be served without parole eligibility in the Tennessee Department of Correction.  In this appeal as of right, the defendant raises one issue: whether the trial court erred in admitting the testimony of the mother of the victim concerning a prior alleged assault on the victim by the defendant.  We conclude that the evidence was admissible, having satisfied all three conditions for admissibility of evidence of prior bad acts pursuant to Tennessee Rule of Evidence 404(b)(1)-(3).  The judgment of the trial court is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which DAVID H. WELLES, J., and L. TERRY LAFFERTY, SR.J., joined.

Thomas E. Hansom, Memphis, Tennessee, for the appellant, Corwyn E. Winfield.

Paul G. Summers, Attorney General and Reporter; Kim R. Helper, Assistant Attorney General; William L. Gibbons, District Attorney General; and Rosemary Andrews, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The defendant and the victim, Chijuana Bassett, both in their early twenties at the time of the offense, had been in a romantic, but apparently volatile, relationship since their high school days at Fairley High School in Memphis and together had a five-year-old daughter.  The relationship had lasted some nine years.  The victim and their daughter lived with the victim's mother, Shirlean Bassett.  The defendant had his own residence and was employed as an aircraft maintenance mechanic at Northwest Air Link.

Officer Brian Nemec testified that on November 25, 1997, he was at Methodist Hospital-South checking on a call for an attempted suicide.  He and his partner were just exiting through the

first set of glass doors at the emergency room of the hospital when he saw a vehicle drive into the emergency entrance and park in an area he knew was reserved for ambulances. This caught his attention. Officer Nemec testified further as follows:

A. I am still continually walking out the door and I noticed a male that had gotten out of a small - - it was a green car. I just saw him getting out of a green car.

Q. Yes, sir.

A. As he got out, he kind of had a, I wouldn't call it a smile, it was more of a smirk type look on his face. And as I approached the second door [of the hospital exit] the motion detector picked it up. That door opened and that is when the individual that got out of the car looked straight at me. And that is when I noticed his facial expression changed.

Q. And how did it change?

A. It got to more of like a frightened type look and like a scared look.

. . . .

Q. Now, when he arrived at the emergency room, parked there, were his lights flashing?

A. No, ma'am.

Q. Did he honk his horn?

A. No, ma'am.

Q. How did he exit the car?

A. Very - - he pulled forward in and he exited the car, just got out. You know, opened the door and got out and closed the door and started walking towards the actual doors.

Q. Uh-huh. Did he run?

A. No, ma'am.

Q. Did he park the car at an angle? Did he run up on the curb?

A. No, ma'am.

Officer Nemec asked the defendant what had happened, and was told that the victim had called the defendant and said she was coming to his house. Later, the defendant looked outside his house and saw that the victim was sitting in her vehicle. He went to her car, and, finding that she had been shot, moved her to his vehicle and drove her to the hospital.

Officer Nemec testified that, because of the victim's size, it took two attendants, plus Nemec and his partner, to remove the victim from the car. Nemec said that, before the victim was removed from the vehicle, he saw that a quart beer bottle, which was held between the victim's legs, had dew on the outside and was still cold. Also, he saw that the victim's purse was between her ankles on the floorboard. Nemec believed that these observations were inconsistent with the defendant's explanation of what had happened, and asked the defendant about them. The defendant said that when he had moved the victim from one vehicle to another, the purse had been in her hands. However, he did not explain why a bottle of still cold beer was between her legs.

The defendant gave two different explanations of the shooting to investigators. According to the first oral statement, which matched but was in more detail than that given to Officer Nemec, the victim called the defendant at his home on November 25, 1997, and said that she had gotten off work early by giving an excuse about having to pick up their daughter from school because the child was sick. She told the defendant that she wanted to come over to his house. The defendant was cooking something when he heard her drive up and stop in front of his house. When she did not immediately come to the door, he looked outside and saw her slumped over in the car. He went to check on her and realized that she had been shot. The defendant said that he then dragged the victim from her car into his 1993, three-door, green Honda Civic and drove her to the emergency room at Methodist Hospital-South.

After Sergeants Shemwell and Logan had told the defendant of information they had which was inconsistent with this version of the shooting, the defendant then gave a second version. According to the defendant's second version of events,[1] what actually happened was that the victim had paged him from the Circle K on Shelby Drive at approximately 1:30 p.m. When he called her back, she told him she had taken off work early. He told her to come on to the car wash where he was waiting to have his car cleaned. They then drove in her car to a liquor store where he purchased gin. They went back to get his car and then drove to his house where they continued drinking. Subsequently, they left his house in his Honda Civic and were driving east on Shelby Drive when the victim mentioned something about the defendant's handgun. He took the gun out from underneath his seat and the following occurred, according to the defendant:

> She said, "[Y]ou ain't gonna do nuthin with it so put it up." So, I said, "[W]hatever." So at that time I had my right arm around her seat and I was stearing [sic] the car with my right knee and I had the

---

[1]This version is the one the defendant gave in his written statement. The entire statement was read to the jury.

gun in my left hand. At that point, I had cocked it. She reached over as I was uncocking the gun and she grabbed my hand and the gun fired.

When the gun fired, I looked at Chijuana and she was like coughing so I looked down and seen that she had been shot under her left arm near her breast so I drove to Swinnea Road and made a left, then I drove to Winchester and made a left. About Winchester and Airways I called Vonrico from my cellular phone (605-0947) and I told him that I had accidentally shot my girl and I didn't know what to do. So, he told me to take her to the hospital and I told him that's where I was headed and he said that he would meet me there. So I drove down Winchester 'till I got to Graceland and made a left and drove down Graceland past the first stop sign and I threw the gun out in a gutter on Graceland by some leaves on the east curb. I continued down Graceland to Raines Road where I made a right [and] went [down] Faronia where I made a left and drove to Methodist South Emergency Room.

When I got to the hospital I pulled up to the Emergency Door and I got out, ran through the door and there was a policeman standin[g] so I told him that my girl was shot. That's when the doctors and nurses went to the car.

Thus, the defendant maintained that the shooting was accidental. Although he chose not to testify, in his statement read to the jury, the defendant denied that he and the victim were fighting or arguing at the time of the shooting. In fact, the defendant claimed that the two were making plans to marry before Christmas. The defendant explained the presence of several long scratches on the back of his neck in the following statement, "When I get my hair cut, the back of my neck itches a lot so I scratch it with my nails and I have a rash on both sides of my neck and they itch a lot."

Dr. O'Brian Cleary Smith, Shelby County Medical Examiner, testified concerning the victim's injuries and the cause of death. He said that the victim was five feet, four inches tall and weighed 218 pounds. The victim had bruised muscles on the right and left side of the hyoid bone, the bone right underneath the jaw, as well as bleeding behind the esophagus. Dr. Smith testified that such injuries were consistent with a "blow to the throat or it could be a squeezing type action which would cause the tissues to be crushed underneath." Dr. Smith also stated that it was possible to damage underlying tissues without damaging the skin.[2] The choking type injuries to the victim were described by Dr. Smith as "contemporaneous" with the gunshot wound, in that the injuries to the victim's neck could have occurred no more than an hour prior to the gunshot wound. Dr. Smith

---

[2] Photographic evidence did not reveal marks to the victim's neck, and Dr. Smith testified on cross-examination that he saw no markings on the victim's neck.

-4-

testified further that the injuries to the victim's neck could not have been caused by the intubation of the victim during the emergency room resuscitation procedures.[3]

The gunshot wound suffered by the victim was classified by Dr. Smith as a "loose contact gunshot wound" or one where the muzzle of the weapon "would had [sic] been pressed up against the cloth surface and the cloth up against the skin at the time the weapon was fired." It was a wound that would cause death in about seven to eight minutes without intervention. Dr. Smith described the path of the single gunshot wound that entered the victim's body on the left side at the top of the left armpit in the following testimony:

> Of the gunshot wound that comes in here at Gunshot Wound A, went through the skin and then fractured the third rib, went down and bruised the left upper lobe of the lung, went through the heart, went through the diaphragm, which is a sheet of muscle that is [sic] the chest organs from the abdominal organs, went through the diaphragm, injury of the stomach, injury of the pancreas, injury of the liver. Went down towards the center line cord, the spine of the body, going through the aorta, which is the largest artery of the body, and lodged in the spine, not the spinal cord, but just the spine itself, just the bone, at T12, which is the last thoracic vertebrae, the last vertebrae that has a connection to a rib. And that bullet was recovered from that area.

The bullet taken from the victim's body was identified by Tennessee Bureau of Investigation Special Agent Steve Scott as a .22 caliber bullet. According to the defendant's statement, the victim was shot with a ".22 caliber revolver, 6-shot, black with pistol grip handles," a weapon he claimed to have thrown from his car. A thorough search by police of the area where the defendant said he threw the weapon was unsuccessful. Officer Robert Martin of the Memphis Police Department testified that on August 19, 1998, some nine months after the shooting, he and his partner recovered a .22 caliber revolver with pistol grip handles from the trunk of the green Honda Civic owned by the defendant. Special Agent Scott was unable to determine conclusively that the bullet taken from the victim's body had been fired from the weapon retrieved from the defendant's car trunk, but neither was he able to exclude the weapon as the murder weapon. Laboratory results were inconclusive.

---

[3]The autopsy of the victim revealed the presence of ethyl alcohol at a blood level of .08 grams per decaliter but no drugs.

# ANALYSIS

In his sole issue on appeal, the defendant contends that the trial court erred when it allowed the victim's mother, Shirlean Bassett, to testify concerning a prior bad act of the defendant, in violation of Tennessee Rule of Evidence 404(b). The defendant points to the use made of the evidence by the prosecutor during her closing argument as constituting the unfair prejudice he suffered.

Ms. Bassett testified that on April 10, 1997, the victim and the victim's daughter were living with her at the McKellar Woods Apartments. On this day, Ms. Bassett and the victim had just arrived home from work when someone banged on their door. Ms. Bassett answered the door. She recognized the person at her door as the defendant, Corwyn Winfield. The victim stepped outside of the apartment to talk to him. Ms. Bassett went to her room to change clothes from work. A few moments later, a neighbor from a downstairs apartment knocked on her door and told her that the defendant was beating up her daughter. Ms. Basset testified to the following:

> A. I ran out of the house, ran downstairs. And she was down on the ground and he had her down beating her. He had been beating her and he was pulling her across the pavement by her hair.
>
> Q. Okay. What did you do when you saw that, Ms. Bassett?
>
> A. I grabbed his sweater, tried to pull him off of her. He backed away from her and pushed me. Turned around to me and pushed me and balled up his fist as if he were going to hit me because I was trying to get him off of her.
>
> Q. Did Chijuana sustain any injuries as a result of this?
>
> A. Yes, she did.
>
> Q. What were those injuries?
>
> A. She had a sprained right knee.
>
> Q. Okay. And did Chijuana file charges as a result of this?
>
> A. Yes, she did.
>
> Q. Were these charges still pending at the time of the death?
>
> A. Yes, they were.

On cross-examination, Ms. Bassett admitted that she did not know what precipitated the altercation, nor did she see the defendant actually hit her daughter.

The testimony of Ms. Bassett is of a prior bad act of the defendant, and its admissibility is controlled by Tennessee Rule of Evidence 404(b), which provides as follows:

> Other Crimes, Wrongs, or Acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:
>
> (1) The court upon request must hold a hearing outside the jury's presence;
>
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence; and
>
> (3) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Generally, this rule is one of exclusion, and evidence that an accused has committed some other crime or bad act independent of that for which he is charged is inadmissible, even though it may be a crime or act of the same character as that for which the accused is on trial. See State v. Howell, 868 S.W.2d 238, 254 (Tenn. 1993). If, however, evidence that a defendant has committed a crime separate from the one for which he is being tried is relevant to some matter actually in issue in the case on trial and its probative value is not outweighed by the danger of its unfair prejudicial effect, the evidence may be admitted. Id. Legal authorities support this restrictive approach "because 'other act' evidence carries a significant potential for unfairly influencing a jury." Neil P. Cohen et al., Tennessee Law of Evidence § 404.7 at 172 (3d ed. 1995). "Having heard about the 'other act,' a jury may be more inclined to find the defendant guilty of the act charged." Id. at 170.

The findings which the trial court must make in determining whether such evidence is to be admitted was explained in State v. Dubose, 953 S.W.2d 649 (Tenn. 1997): "The court must find on 'evidence heard outside the jury's presence' that the evidence is relevant to a 'material issue' and that the probative value of the evidence is not 'outweighed by the danger' that the evidence will cause unfair prejudice." Id. at 652 (citing Tenn. R. Evid. 404(b)(1)(2) & (3); State v. McCary, 922 S.W.2d 511, 513-14 (Tenn. 1996)). Additionally, the trial court must be satisfied that the evidence of the other act is clear and convincing. State v. Parton, 694 S.W.2d 299, 303 (Tenn. 1985).

The trial court held a hearing outside the jury's presence at which time Ms. Bassett testified to the prior bad act. See Tenn. R. Evid. 404(b)(1). The trial court concluded that the evidence of the prior assault was admissible:

> The Court is certainly of the opinion that, and certainly based on what the other cases, State versus Turnbull (spelled phonetically), State versus (indiscernible), we have a situation where the information would certainly go towards what the hostility that the defendant has towards the victim. Certainly go to malice. What the defendant's intent was.
>
> Though I understand premeditation is not necessary for murder second degree, but certainly it's got to be a knowing killing with intentional, and show a – and as the case indicates – a solo purpose for harming the victim.
>
> The Court is of the opinion that this testimony would be admissible, I think, for that purpose as indicated. It's the exception really to 404.

Although the trial court concluded that the evidence was admissible to show intent, it did not make the additional determination that its probative value outweighed its prejudicial effect. Accordingly, as the reviewing court, we cannot apply the abuse of discretion standard and, instead, will reexamine this evidence to ascertain whether it should have been admitted.

## I. Relevance to Material Issue

The first condition for admissibility is "that a material issue exists other than conduct conforming with a character trait." Tenn. R. Evid. (404)(b)(2). Material issues that satisfy this second condition include evidence offered to prove the motive of the defendant, his identity, his intent, the absence of mistake, opportunity, or as a part of a common scheme or plan. See Bunch, 605 S.W.2d at 229. Such material issues make the evidence of a prior bad act relevant.

Our supreme court has determined that evidence of prior threats and prior acts of physical violence perpetrated by a defendant against a murder victim are relevant to show the defendant's motive in the murder. In State v. Smith, 868 S.W.2d 561 (Tenn. 1993), the victim's sister testified that some two months prior to the murder of her sister and her sister's two sons, the victim, who had rope burns on her wrists and a red mark on her throat, told her that the defendant had tied her up by the wrists and neck, raped her, and threatened to kill her. See id. at 574. Our supreme court concluded that the testimony was admissible as relevant "not to prove the Defendant acted in accord with this character but as part of the proof establishing his motive for the killings." Id.

Our sister jurisdictions have found similar bad act evidence admissible. In Cannon v. State, 776 So.2d 729 (Miss. Ct. App. 2000), cert. denied (2001), the issue was whether the trial court erred by overruling the defendant's motion *in limine* to exclude testimony about prior threats he allegedly made to the murder victim over the course of their relationship. See id. at 733. A witness working at the same store as the victim testified that, approximately six months prior to the shooting of the victim, the defendant entered the store and threatened to rape the victim. See id. On appeal, the decision of the trial court to admit the evidence was upheld on the basis that it was admissible to show malice, premeditation, and intent. See id. at 734.

In Boone v. State, 506 S.E.2d 884 (Ga. Ct. App. 1998), cert. denied (1999), the defendant sought to exclude from evidence threatening letters he had written to his wife during their separation and while she was involved in a romantic relationship with the victim. See id. at 885. The Georgia Court of Appeals upheld the decision of the trial court to allow the evidence, noting that "[e]vidence of prior difficulties between the victim and the accused are admissible to show motive, intent, or bent of mind toward the victim." Id. (citing Cannon v. State, 360 S.E.2d 592 (1987)).

In State v. Humphrey, 694 So.2d 1082 (La. Ct. App. 1997), the defendant was convicted of manslaughter in the stabbing murder of his former girlfriend. See id. at 1083. The State offered testimony of an eyewitness that hours prior to the murder, the defendant showed up at the victim's residence and threatened the victim, calling her a bitch and a whore. See id. at 1085. The decision of the trial court to admit the evidence was sustained on appeal. The appellate court concluded that the threats made by the defendant towards the victim were probative of the defendant's intent. "Further, the testimony was probative of a genuine issue in question because the defense had claimed that the killing was an accident." Id. at 1085-86.

Here, the evidence of the prior violent act of the defendant showed the nature of the relationship between the defendant and the victim and his hostility toward her. This evidence was relevant, as the trial court concluded, to the material issue of the defendant's intent to harm the victim.[4] See, e.g., State v. Turnbill, 640 S.W.2d 40, 47 (Tenn. Crim. App. 1982) ("[T]he prior relations between the victim and the appellant were relevant matters for the jury's consideration on the question of the appellant's intent."). Evidence of the defendant's prior assault of the victim, offered as proof of intent and rebuttal of the defense of accident, was, therefore, relevant to material issues in his trial for second degree murder.

---

[4]Second degree murder is the "knowing killing of another." Tenn. Code Ann. § 39-13-210(a)(1) (1997). To prove second degree murder, the State must show, beyond a reasonable doubt, that the defendant acted with the requisite culpable mental state, that is, that the defendant acted "knowingly." A defendant acts knowingly "when he or she is aware of the conduct or is practically certain that the conduct will cause the result, irrespective of his or her desire that the conduct or result will occur." Id. § 39-11-302 Sentencing Commission Cmts. "When acting knowingly suffices to establish an element, that element is also established if a person acts intentionally." Id. § 39-11-301(a)(2).

## II. Balancing Test: Probative Value vs. Prejudicial Effect

The second condition to be satisfied before evidence of other bad acts is admissible is that its probative value must not be outweighed by the danger of unfair prejudice. See Tenn. R. Evid. 404(b)(3). The defendant argues that he suffered unfair prejudice as the result of the erroneous admission of the testimony concerning the prior assault on the victim because the prosecutor was able to improperly refer to this incident and argue that the defendant had acted in conformity with a character trait.

Specifically, the defendant points to the following portions of the State's closing argument:

> This trial is about fear, intimidation, humiliation and control. That ultimately resulted in the death of Chijuana Bassett.
>
> Sitting before you today is a man that drug a two hundred plus pound woman across the packing [sic] lot by her hair and couldn't control her. Threatened her mother at the same time with his fist and still couldn't control her. Shoved her and still couldn't control her. And ultimately pressed a gun up against the ribs of her chest, so close to her that when the bullet was fired there was soot and debris all the way into her heart and her ribs.
>
> It is about control. That is what this trial is about is because this man could not control this woman. He couldn't drag her across the parking lot and couldn't control her. Couldn't threaten her mother and control her. Couldn't choke it out of her. But he ultimately killed her to control her, and that is the ultimate control.

The defendant also points to statements by the prosecutor that basically recount Ms. Bassett's testimony, as well as to the following argument that, according to the defendant, invited the jury to find that the shooting was an act in conformance with the earlier assault:

> Is it hard to believe that a man who has drug her by her hair, assaulted her and choked her wouldn't waive [sic] a gun at her? Is it hard to believe that? Is it hard to believe he wouldn't point a gun at her and say, bitch, do what I'm telling you to do? Is that hard to believe? I submit to you, no, it is not. Because this is a man that lives for fear, the fear and intimidation and control over Ms. Bassett.

The weighing of the probative value and prejudicial effect of evidence of other crimes is determined from the evidence itself and not by the use, or alleged misuse, of the evidence during final arguments. In fact, standards different from those established by Tennessee Rule of Evidence 404(b) are used to determine the propriety of a prosecutor's final argument and, if improper, its

effect upon the trial. We conclude that the probative value of the questioned testimony outweighed its prejudicial effect.

We will now consider the defendant's claims as to the prosecutor's arguments. First, we note that since the defendant did not contemporaneously object to any portions of the closing argument of the State, any objection on appeal is waived. See Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."). However, even if the defendant had objected, we conclude that the assailed comments were based on the evidence and, read in context, referred to the tumultuous and troubled nature of the defendant's relationship with the victim. Accordingly, we conclude that the prosecutor's argument was not improper.

### III. Sufficiency of Proof of Other Act

The required quality of the proof as to the other act, the third consideration of the trial court, is explained in Neil P. Cohen et al., Tennessee Law of Evidence § 404.7, at 173-74 (3d ed. 1995) (footnotes omitted):

> *Finding clear and convincing evidence of other act* – Third, although not specifically included in Rule 404(b), the court must also find that the evidence is *clear and convincing* that the defendant committed the other crime. This test, approved by the Tennessee Supreme Court in *State v. Parton*, [694 S.W.2d 299, 303 (Tenn. 1985)], was adopted by the Tennessee Supreme Court's Advisory Commission on Civil Procedure for use with Rule 404(b). The use of the "clear and convincing" test is sensible. Evidence offered under Rule 404(b) may have a devastating impact on the case as the trier of fact could easily misuse the evidence as proof of bad character. The trier of fact should not be exposed to this evidence unless there is significant proof that the defendant actually committed the act offered under Rule 404(b).

The victim's mother testified that, although she did not observe the initial actions of either party, she saw that the defendant, moments after he had come to call on her daughter, had her on the ground beating her and then "dragged her across the pavement by her hair." Accordingly, we conclude that the evidence was "clear and convincing" of the defendant's prior assault upon the victim.

## CONCLUSION

Based upon the foregoing authorities and reasoning, we conclude that the trial court did not err in admitting evidence of the defendant's prior assault upon the victim. The judgment of the trial court is affirmed.

_____
ALAN E. GLENN, JUDGE