# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### December 10, 2002 Session

## STATE OF TENNESSEE v. RODNEY M. SPURGEON

**Direct Appeal from the Criminal Court for Sevier County**
**No. 7379     Richard R. Vance, Judge**

---

**No. E2002-00931-CCA-R3-CD**
**October 9, 2003**

---

On May 3, 2002, a Sevier County jury convicted the defendant, Rodney M. Spurgeon, of arson and the burning of personal property. For these offenses the jury levied fines of $10,000 and $2,500, respectively. After denying the defendant's motion for new trial, the trial court sentenced him to ten years for the arson conviction and four years for setting fire to personal property. These convictions are to run concurrently as a Range II offender. The defendant appeals these convictions. His sole argument on appeal is whether unfair prejudice resulted from the trial court's failure to comply with the strict guidelines of Tennessee Rule of Evidence 404(b). We find no reversible error and therefore affirm the convictions.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Trial Court are Affirmed.**

JERRY L. SMITH, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and JAMES CURWOOD WITT, JR., J., joined.

Donald A. Bosch and Andrew S. Roskind, Knoxville, Tennessee (on appeal); and William M. Liebrack, Newport, Tennessee (at trial), for the appellant, Rodney M. Spurgeon.

Paul G. Summers, Attorney General & Reporter; Angele M. Gregory, Assistant Attorney General; Al Schmutzer, Jr., District Attorney General; and Steven R. Hawkins, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Factual Background

In the early morning hours of March 28, 1998, three rings of the doorbell awoke Louise Hurst, the victim. This series of rings was a signal when her daughters wanted to be let in the house late at night. She used a flashlight to go to her carport door. She was afraid to open the door because she heard a male voice on the other side of the door. She heard him say, "Get up, time to get up. Goddamn, this is not the policeman." The victim recognized the voice on the other side of the door as her son-in-law, Rodney Spurgeon, the defendant. Shortly after she heard the voice, she heard a

"floof" sound. She looked out the carport door to see the inside of her car on fire. She then saw a vehicle pulling out of her driveway The victim did not have a phone, so she ran to her sister's house for help. They called the fire department and returned to her house. By the time they returned, flames had engulfed the front of the house as well as the carport. The fire destroyed the house and the victim's car.

The victim and the defendant had known each other for several years before the fire. In January 1991, the victim and her husband divorced. As part of the divorce decree, the victim was to live in the house until her younger daughter reached the age of 18. Mr. Hurst committed suicide in March of the same year. At that point, the victim owned fifty percent of the house and her two daughters each inherited a twenty-five percent interest in the house. Soon after Mr. Hurst committed suicide, the defendant moved into the house with the victim's older daughter, Samantha, who was fourteen at the time. The defendant was twenty-four. During this time, the victim's younger daughter, Heather, would sometimes sleep in the same bed with the defendant and Samantha. On more than one occasion, the defendant digitally penetrated Heather while she was in their bed with her sister and the defendant. Heather was ten or eleven at the time. The defendant also attempted to sexually assault Ms. Hurst while she was asleep in bed. She was successful in fending him off. After his attempted assault on her, Ms. Hurst forced the defendant to leave her house. Samantha left at the same time. The victim and Heather never swore out warrants for these incidents.

On March 17, 1998, several days before the fire, Heather awoke to a man's voice in her room. It was the defendant. He told her to "just lay there and everything would be okay." Heather then began screaming for help. He covered her mouth and nose so she couldn't breathe and threatened to break her neck. Ms. Hurst awoke to Heather screaming "Mama he's trying to kill me." When Ms. Hurst attempted to help her daughter, the door was locked. She beat on the door until the defendant opened it. She told the defendant to leave her house, which he did. Ms. Hurst and her daughter then went to swear out warrants against the defendant.

On the morning of March 28, 1998, the fire occurred. Immediately after the fire, Ms. Hurst spoke with a detective from the Sevier County Sheriff's Department, Mark Turner, who answered the emergency call to her house. The victim told him that she believed the defendant had set her car on fire. Turner then went to the defendant's house around 4:00 or 4:30 in the morning. When he arrived at the defendant's trailer home, he found a pick-up truck with a can of gasoline in the back. The hood of the truck was warm, as if it had been driven recently. The lights were on in the house, but no one answered the door when Turner and other officers knocked. Eventually, the sheriff's department arrested the defendant.

On March 30, 1998, a Fire and Arson Investigator arrived to investigate the fire at the victim's house. He concluded that the fire started in the victim's car in the front seat area and then spread to the carport roof. He also believed that an accelerant, such as paper or gasoline, could have been used because the burn patterns on the bottom of the car door were indicative of an accelerant. His final conclusion was that the fire was set by human hands.

The grand jury indicted the defendant on October 5, 1998 for aggravated arson and setting fire to personal property or land. The defendant went to trial on May 2, 2001. On the first day of trial, the State asked for a hearing in accordance with Rule 404(b) of the Tennessee Rules of Evidence ("404(b) hearing") regarding the admissibility of evidence concerning the assaults when the defendant lived with the Hursts and the assault against Heather on March 17, 1998. After hearing arguments from both sides, the trial court held that the State could present this evidence at trial.

At trial, the defendant put on witnesses to testify to his alibi. The defendant's brother and friend testified that they were drinking beer at Buddy's Bar. They decided that after the bar closed at midnight, they would go "four-wheeling." The defendant left the bar early and went to pick up his wife saying he would meet them at a truck stop to go four-wheeling. Both of these witnesses further testified that they did go four-wheeling with the defendant after he went to pick up his wife. They both testified that they pulled the truck of two coon hunters out of a mud hole while they were four-wheeling. They also stated that the defendant and his wife left around 3:15 a.m.

One of the coon hunters also testified at the trial. He stated that on the night in question he was coon hunting with a friend. Their truck got stuck in a mud hole. The defendant, his brother and their friends pulled them out of the hole. The hunter did not know the defendant before this encounter.

The defendant's wife, Samantha Spurgeon, also testified at the trial. She testified that the defendant picked her up at their home at the Campers Paradise trailer park a little before midnight on the night of the fire to go four-wheeling. She stated that they stopped to pull the truck of some coon hunters out of a mud hole at some point during the night. Ms. Spurgeon said that they were home by 3:30 a.m. She stated they did not hear any officers knocking on the door of their trailer home at 4:00 or 4:30 that morning. Ms. Spurgeon also testified that her sister, Heather Hurst, told Ms. Spurgeon that she wanted to move out of Ms. Hurst's house the day of or the day before the March 17 attack. Ms. Spurgeon stated that she sent the defendant to the house that night to check on her sister. Ms. Spurgeon also stated that under her parents' divorce decree, her mother was to remain in possession of the house until Heather was eighteen. After her father's death, Ms. Spurgeon owned a fourth, her sister owned a fourth and her mother owned half of the house. After the house burned, she collected one-fourth of the insurance money. Her mother and sister sued Ms. Spurgeon to obtain the insurance proceeds.

On May 3, 2001, after two days of trial, the jury convicted the defendant of arson and setting fire to personal property. The trial court sentenced the defendant to ten years to be served as a Range II multiple offender at 35% with a $10,000 fine and $22,500 restitution for the arson, and sentenced him to four years to be served as a Range II multiple offender at 35% with a $2500 fine and $15,000 in restitution for setting fire to personal property. The trial court ordered that these sentences be served concurrently. The trial court also ordered a permanent restraining order banning the defendant from physical or verbal contact with the victim, Louise Hurst, or her daughter Heather Hurst.

## Prior Bad Acts

The first day of trial, the trial court held a 404(b) hearing before the empaneling of the jury. At this hearing, the State argued that the evidence of the defendant's prior bad acts was necessary to prove motive, intent and identity. The State wanted to present evidence of two incidents that occurred several years prior to the burning of the victim's house and property. The State asked the trial court to allow into evidence the following facts. At the time of the victim's husband's death in 1991, her daughter Samantha was fourteen and dating the defendant. After Mr. Hurst's death, the defendant moved into the Hurst household and shared a room with Samantha. The defendant was twenty-four at the time. While living in the house, Ms. Hurst claims that the defendant crawled into bed with her and attempted to force himself upon her. She successfully resisted this attack. The State also asked to include testimony of Heather Hurst, Ms. Hurst's youngest daughter and younger sister to the defendant's wife, to the effect that the defendant sexually assaulted her while he lived at the house. In addition, the State wanted to include Heather's testimony concerning an attack by the defendant on Heather in the middle of the night on March 17, 1998, just days before the fire. Immediately after the defendant left the Hurst house following this attack, the victim and Heather swore out warrants for criminal trespass and assault against the defendant.

At the conclusion of the hearing, the trial court held:

> **THE COURT:** In considering any evidence of prior misconduct, prior bad acts, the Court must look to whether or not it is relevant to any of the issues presented in the charges of Aggravated Arson and Setting Fire to Personal Property, the case for trial today. The relationship between the parties is relevant.
>
> . . . .
>
> Bad blood between parties is certainly relevant on issues of motive and intent and in this case I don't know what the facts are relating to the actual offense but it certainly would be relevant on issues of motive and intent, that there was bad blood between these parties.
>
> If there was no incident of March 17th, 1998 the previous acts would certainly be remote. But since the incident that occurred, alleged to have occurred on March 17th is very similar to the incidents that the State says led to Mrs. Hurst making Mr. Spurgeon leave her home and coming very close in time to this arson fire that occurred shortly after, some nine days after she had taken warrants out against him for those incidents, the Court feels it is relevant on the issues of intent, issues of motive. I don't know about identity because I haven't heard the proof regarding the arson itself. But certainly on intent and motive would be very relevant. It's not a surprise.
>
> The Court will permit the introduction of that testimony up to the point where he was charged with that offense. Whatever may have happened after that is not relevant other than the fact that she did take out warrants, he was arrested so that he

knew that she had taken these charges out against him. That's certainly relevant and the Court will permit its introduction.

At trial, the trial court allowed the State to present the prior bad acts evidence in detail in accordance with the above decision.

Evidence that an accused has committed some other crime or bad act independent of that for which he is charged is generally inadmissible, even though it may be a crime or act of the same character as that for which the defendant is on trial. Tenn. R. Evid. 404(b); State v. Howell, 868 S.W.2d 238, 254 (Tenn. 1993), cert. denied, 510 U.S. 1215, 114 S. Ct. 1339, 127 L. Ed. 2d 687 (1994). However, if evidence that a defendant has committed an act separate and apart from the one for which the defendant is on trial is relevant to some material matter at issue in the case on trial and if its probative value is not outweighed by the danger of its prejudicial effect, the evidence may be admitted. Tenn. R. Evid. 404(b); Howell, 868 S.W.2d at 254. Issues to which such evidence may be relevant include identity, motive, common scheme or plan, intent or the rebuttal of accident or mistake defenses. Tenn. R. Evid. 404(b), Advisory Commission Comments.

By its very nature, evidence that the defendant has committed a bad act other than that for which he is on trial carries some risk of unfairly prejudicing the defendant. In recognition of this risk, Rule 404(b) establishes special procedures which must be followed before evidence of prior bad acts may be admitted. See Tenn. R. Evid. 404(b), Advisory Committee Comments. The procedures which must be satisfied before allowing such evidence are:

(1) The court upon request must hold a hearing outside the jury's presence;
(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence; and
(3) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b). Finally, the court must find that the evidence is clear and convincing that the defendant committed the prior act. Id. Advisory Commission Comments; State v. Parton, 694 S.W.2d 299, 303 (Tenn. 1985).

Generally, whether to admit evidence is within the sound discretion of the trial court, and its decision will not be overturned absent an abuse of discretion. State v. Bigbee, 885 S.W.2d 797, 807 (Tenn. 1994). However, when evidence of prior bad acts is in question the trial court must follow the procedural requirements under Rule 404(b). State v. DuBose, 953 S.W2d 649, 652 (Tenn. 1997). The trial court must substantially follow the outlined procedures in order for the abuse of discretion standard to be applied upon review by this Court. Id.

It is clear that the trial court substantially complied with the requirements of Rule 404(b). Therefore, we must decide whether the trial court abused its discretion when it admitted the evidence in question.

It is well-established that a trial court may admit evidence of prior bad acts by a defendant against a victim to show intent and motive. In State v. Glebock, 616 S.W.2d 897, 905-06 (Tenn. Crim. App. 1981), our Court held that prior bad acts between a victim of a violent crime and a defendant are admissible as relevant evidence to "indicate hostility toward the victim and a settled purpose to harm or injure [the victim]" where there was evidence of previous harassment and threats by the defendant against the victim. In State v. Turnbill, 640 S.W.2d 40, 46-47 (Tenn. Crim. App. 1982), we once again allowed evidence of the defendant's prior bad acts in the form of a guilty plea of criminal trespass to be admitted when the defendant had been originally charged with robbery of the same victim. In Turnbill, we held that the evidence of the prior bad act was relevant for purposes of the defendant's intent. In State v. Smith, 868 S.W.2d 561 (Tenn. 1993), our Supreme Court allowed similar evidence of prior bad acts by a defendant against the same victims. The Court referenced the State's citation of Glebock and Turnbill supporting this position. The Court also stated that the victims in that case had filed charges against the defendant based upon the prior assaults. In conclusion, the Court held that prior bad acts could be used to prove motive in addition to proving intent. Smith, 868 S.W.2d at 574.

The evidence of both the earlier incidents when the defendant lived with the victim and the incident just days before the fire falls into the parameters set out by the line of cases outlined above. These prior physical and sexual attacks upon the victim and her daughter show the violent nature of the ongoing relationship involving the defendant and the Hurst family.

The incident, which occurred several days before the fire, is clearly admissible under the requirements of Rule 404(b). This incident is evidence admitted to show the relationship of the victims and the defendant immediately prior to the crime and to establish intent and motive. There is definitely no abuse of discretion with regard to the admission of this evidence at trial.

We also conclude that there was no abuse of discretion with regard to admitting evidence of the earlier incidents. Although, as was the trial judge, we are somewhat concerned with the remoteness of these incidents to the crime at issue, we believe that the trial court's assessment that these incidents are relevant to show the nature of the long-lasting acrimony between the defendant and Ms. Hurst which in turn tends to prove the motive for commission of the arson and burning of personal property.

## Conclusion

For these reasons, we find the trial court's decision to admit the evidence of the defendant's prior bad acts towards the victim and her daughter was not an abuse of discretion. Therefore, the judgments of the trial court are AFFIRMED.

_____
JERRY L. SMITH, JUDGE