IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs October 29, 2019, at Knoxville

**STATE OF TENNESSEE v. JOSHUA FISHER**

**Appeal from the Criminal Court for Shelby County**
No. 17-02467     Lee V. Coffee, Judge
_____

**No. W2018-02173-CCA-R3-CD**
_____

The Defendant, Joshua Fisher, appeals his conviction for first degree premeditated murder for which he received a sentence of life imprisonment. On appeal, the Defendant contends that the trial court erred in admitting evidence of the Defendant's prior threats and acts of violence against the victim pursuant to Rule 404(b) of the Tennessee Rules of Evidence. Upon reviewing the record and the applicable law, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, P.J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and J. ROSS DYER, JJ., joined.

Phyllis Aluko, District Public Defender; and Harry E. Sayle III (on appeal) and Constance Barnes (at trial), Assistant Public Defenders, for the appellant, Joshua Fisher.

Herbert H. Slatery III, Attorney General and Reporter; Katharine K. Decker, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Marianne Bell and Jamie Kidd, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**FACTUAL AND PROCEDURAL HISTORY**

The Defendant was convicted of first degree premeditated murder of his girlfriend, Ms. Bria Isaac, with whom he had been involved in a ten-year relationship. According to the evidence presented at trial, in October 2016, the Defendant shot the victim twice while in her apartment in Memphis, Tennessee, and he fled the scene. Members of the

victim's family discovered her body a few days later. Months after the shooting, the Defendant was arrested in a home in Stanton, Tennessee. He gave a statement to the police, asserting that the gun was accidentally fired during a struggle.

## Rule 404(b) Hearing

Prior to trial, the State filed a motion and a notice of its intent to introduce evidence of sixteen instances of prior acts of violence and threats by the Defendant against the victim pursuant to Tennessee Rule of Evidence 404(b). The State maintained that the evidence was necessary to establish premeditation and intent and to rebut the Defendant's claims of self-defense and an accidental shooting. The State also maintained that the proof constituted contextual background evidence of the nature of the relationship between the Defendant and the victim. During a pretrial hearing, the State presented the testimony of fifteen witnesses in support of its motion.

According to the evidence presented by the State, on September 29, 2009, Officer Maurice Davis of the Memphis Police Department ("MPD") responded to a report of a domestic assault at an apartment. The victim reported that the Defendant twisted her leg and punched her in the left eye with a closed fist, and Officer Davis observed "slight discoloration" around the victim's left eye.

On January 9, 2010, MPD Officer Jackson Ngien responded to a call at an apartment where he spoke to the victim. The victim appeared upset and stated that during an argument, the Defendant pushed her down and hit her head and face. She said the Defendant then left her apartment with her cellular phone, Electronic Benefit Transfer card, bus pass, birth certificate, and Tennessee identification card. Officer Ngien did not observe any injuries on the victim and testified that the victim appeared more concerned about her items being stolen than the assault.

On February 26, 2010, MPD Officer Derek Pittman responded to a domestic violence call and spoke to the victim, who reported that the Defendant punched her in the face, pulled her hair, and dragged her around the room. Officer Pittman observed a bruise on the victim's upper lip.

On March 4, 2010, Officer Pittman responded to another domestic violence call at the same address. The victim told Officer Pittman that the Defendant wanted to spend the night and that she refused to allow the Defendant inside her apartment. The victim said the Defendant became upset, punched her in the face with a closed fist, and kicked her all over her body. The assault was captured on video surveillance, and Officer Pittman was able to confirm that the assault occurred by reviewing the video. He did not

observe any injuries on the victim. He did not make a copy of the video, and he was unsure whether the investigator assigned to the case did so.

On August 22, 2001, Ms. Melissa Isaac, the victim's mother called the police after the Defendant hit the victim in the face with a cheeseburger that the victim had just reheated. Ms. Melissa Isaac tried to make the Defendant leave her home, but he continued to fight with her and the victim. Ms. Melissa Isaac stated that the Defendant had been barred from her home after he was arrested for choking the victim. MPD Officer John Hawkins responded to the call and spoke to the victim, who reported that the Defendant knocked on the door to her mother's home, that the victim opened the door, and that the Defendant pulled her down by her hair and punched her in the face. The victim stated that the Defendant also threw a plate of food at her and threatened to return later. Officer Hawkins observed that the victim had a swollen eye.

On December 3, 2011, at approximately 2:19 p.m., MPD Officer Matthew Land responded to a domestic violence call at a convenience store. He spoke to the victim, who stated that at approximately 6:00 a.m., she and the Defendant argued about a call that she had received from another man and that the Defendant struck her on the right side of her face with a closed fist. The victim explained that she did not call the police immediately after the assault because she was afraid and that she later walked to the convenience store to call the police. Officer Land did not recall whether the victim had any injuries.

On June 13, 2012, the victim called Ms. Melissa Isaac from the hotel room where she and the Defendant had been staying. The victim was crying and stated that the Defendant became angry when she refused to give him money and began hitting her. Ms. Melissa Isaac called the police and went to the hotel room with a neighbor. When she arrived, the victim was in bed, was holding on to the sheets, and was too scared to move. Ms. Melissa Isaac's neighbor told the Defendant that he was wrong for striking the victim and offered to fight the Defendant if the Defendant wanted to fight someone. Ms. Melissa Isaac stated that the victim refused to talk to the police officers because she was afraid.

Lieutenant Lambert Chatman, who was an investigator with the Domestic Violence Unit ("DVU") in June 2012, received the police report and a photograph of the victim taken by the responding officers. He testified that the responding officers observed a scratch to the victim's chin but that the victim denied that it was a scratch. Lieutenant Chatman called the victim about the report and asked if she wanted help. The victim said that she did not need help, that she could not talk to him at the moment, and that he could call her again later. When Lieutenant Chatman called the victim a second time, the victim denied that the Defendant injured her and maintained that the injury to

her chin was a bug bite. Lieutenant Chatman stated that based upon his experience in the DVU, it was not unusual for a victim of domestic violence to later recant.

On January 18, 2013, the victim and the Defendant were staying at Ms. Melissa Isaac's home because the Defendant was homeless. Ms. Melissa Isaac testified that she heard a noise and entered the victim's bedroom where she saw the Defendant choking the victim. Ms. Melissa Isaac got the Defendant off the victim and told him to leave. He refused, and Ms. Melissa Isaac called the police. She said officers came to the scene and arrested the Defendant.

Ms. Dominique Wilkins, the victim's sister, was also present at Ms. Melissa Isaac's home at the time of the assault. Ms. Wilkins testified that she heard the victim scream, and when Ms. Wilkins ran into the room, the victim said the Defendant was trying to fight her because she wanted to go to a store. Ms. Wilkins stated that she heard the Defendant and the victim arguing and that when the victim tried to walk outside, the Defendant grabbed her neck. When the Defendant refused to leave, Ms. Melissa Isaac called the police.

MPD Officer Lucan Pellegra responded to the call, and Ms. Melissa Isaac informed him that the Defendant was intoxicated and grabbed the victim by the neck. Officer Pellegra then spoke to the victim, who stated that the Defendant was intoxicated, did not want her to go to the store as she had planned to do, and grabbed her by the neck to prevent her from leaving. The officers arrested the Defendant. After the Defendant was taken into custody, the victim said the Defendant only grabbed her by her shirt collar.

In early January of 2013, the victim called her cousin, Ms. Takasha Isaac, and was upset. The victim said the Defendant became angry when she refused to give money to him. He "jumped on her face" and put a cigarette out on her face. Ms. Takasha Isaac later saw the injury to the victim's left cheek. The victim did not call the police or seek medical treatment.

On July 23 or 24 of 2013, Ms. Takasha Isaac attended a child's party at Chuck E. Cheese with her mother. The victim also attended the party but refused to come inside. Ms. Takasha Isaac testified that she went outside to the car inside which the victim was sitting and saw that the victim had two black eyes. The victim was crying and stated that on one day, the Defendant had struck her in one eye and that on the following day, the Defendant struck her in the other eye. Ms. Sherry Isaac, the victim's aunt and Ms. Takasha Isaac's mother, also attended the party and offered similar testimony.

- 4 -

On October 22, 2015, MPD Officer Gary Lawson responded to a domestic violence call from the victim's apartment. The victim told him that while lying in bed after work, her boyfriend asked her to go to the store and buy him beer. She stated that when she refused, he grabbed her leg and twisted it. Officer Lawson stated that the police report listed the victim's boyfriend as "Joshua Smithers." Officer Lawson did not know whether the victim provided this name or whether the name was written in error. The victim's boyfriend was not at the scene, and Officer Lawson was unable to locate him. Officer Lawson did not observe any injuries on the victim.

On January 30, 2016, MPD Officer Kerry Moody responded to a domestic violence call at the victim's apartment. The victim, who was "clearly shaken," stated that she took a taxi home from work and that when she arrived at her apartment complex, she saw the Defendant, whom she identified as her former boyfriend, waiting for her "in the shadows." The victim stated that she ran upstairs to her apartment but that the Defendant was able to catch up to her as she was unlocking her door. She said that she tried to get inside her apartment but that the Defendant pulled her braids. The Defendant was able to get inside the apartment and punched the victim in her face. Officer Moody stated that the right side of the victim's face was swollen and that there was a cut around her eye. While Officer Moody and his partner were at the scene, the victim received a call from the Defendant, who told her, "I still got you." Officer Moody did not recall whether he heard the conversation or whether the victim told him about the Defendant's statement.

Officer Moody testified that he had previously responded to multiple calls of domestic disturbances at the victim's apartment that involved the Defendant's trying to enter the apartment and the victim not wanting the Defendant on the premises. Officer Moody and his partner were concerned for the victim's safety due to number of times that the police had been called to the victim's apartment and waited outside the apartment to see if the Defendant returned. The officers later saw the Defendant walking down a road toward the apartment complex and took him into custody.

On January 30, 2016, Ms. Takasha Isaac received a text message from the victim stating that the Defendant had "jumped on her." The victim stated that police officers had caught the Defendant as he was returning to the apartment complex. Ms. Takasha Isaac stated that she went to the victim's apartment where she saw the victim's swollen face. The Defendant also had pulled the victim's braid out on the side of her head. The victim called Ms. Wilkins about the Defendant's attack before the police arrived. The victim was crying and said the Defendant pulled a portion of her hair out of her head and hit her in the face, causing her to have a black eye and a bruise on the side of her face. Ms. Wilkins stated that she later saw the victim, who had a black mark on the side of her face and was missing braids on one area of her head.

On May 24, 2016, MPD Officer Starr Smith testified responded to a domestic violence call at the victim's apartment. The victim, who was upset, stated that after returning from work, she was walking upstairs to her apartment while eating candy, that the Defendant was standing in the breezeway with friends and asked her if she had purchased any candy for him, and that when she said him that she had not, the Defendant became angry and punched her in her face. Officer Smith stated that the victim's left eye was swollen and that there were cuts around the eye. Officer Smith recalled seeing candy on the floor in the breezeway. The victim declined to be transported from her apartment.

The victim called Ms. Wilkins that day and was crying. The victim told her that the Defendant was angry because she was late returning home for work and hit her in her face, bruising the side of her face. When Ms. Wilkins saw the victim the next day, the victim had a black mark on one side of her face and that her face was swollen.

The victim was working at a Captain D's restaurant at the time of the assault. Mr. Mario Maclin, the restaurant manager, testified that in late May of 2016, the victim called and asked if he could bring her check to her. Mr. Maclin explained that policy required that employees come to the restaurant to sign a verification of their receipt of their checks. Mr. Maclin told the victim that he could not deliver her check to her, and the victim stated that she was too embarrassed to enter the restaurant. Mr. Maclin met the victim in the restaurant's parking lot. He stated that the victim was upset and visibly shaken. Her eye was closed and was black, purple, and green "like a fresh bruise that had come from a fight or altercation." The victim told Mr. Maclin that her boyfriend had attacked her.

In July of 2016, the victim called Ms. Takasha Isaac and was upset. The victim stated that she had made the Defendant leave her apartment earlier in the day because he was trying to fight her before she went to work. The victim said the Defendant came to her work, would not leave until she agreed to allow him back into her apartment, and was stalking her.

On October 3, 2016, Ms. Takasha Isaac was talking with the victim over the telephone when the Defendant interrupted them and asked the victim for money. The victim told him that she did not have any money because she had to pay rent. The victim told the Defendant numerous times to "get out of her face." The Defendant became angry and told the victim that he hoped someone raped, robbed, and killed her. Ms. Takasha Isaac told the victim that she needed to leave the Defendant, and the victim stated, "If the phone hang[s] up, call the police." They were able to finish their conversation, and Ms. Takasha Isaac did not call the police. Later that night while Ms. Takasha Isaac was on her way to work, the victim called her and was upset. The victim stated that the Defendant told her that he was going to shoot her in in the head, stand over

her, and spit on her. The victim said that she was trying to leave the Defendant but that he threatened to kill her if she left him. The victim was afraid because the Defendant knew where all of her relatives lived.

Ms. Melissa Isaac testified that by October of 2016, the victim was still working at Captain D's and had taken a second job at Rose's, a department store. Captain D's was within walking distance of the victim's apartment, and Ms. Melissa Isaac would drive the victim to Rose's on the days in which she was scheduled to work. On Wednesday, October 12, 2016, Ms. Melissa Isaac and Ms. Wilkins went to the victim's apartment in order to drive her to Rose's. Ms. Melissa Isaac blew the horn, and the Defendant came out of the victim's apartment. The Defendant said that the victim was still at work at Captain D's and that he would get her, and he ran toward Captain D's. Ms. Melissa Isaac stated that she believed that the Defendant would "start something" with the victim because the victim was working late. Ms. Melissa Isaac had Ms. Wilkins drive to Captain D's.

Ms. Melissa Isaac and Ms. Wilkins arrived at the restaurant as the victim was walking outside. Ms. Melissa Isaac stated that the Defendant was "walking directly behind [the victim], walking on her heels, in the back of her heels. Every step she made, he made it, too." The Defendant did not give the victim "time to step, like he was pushing her as she walked." The Defendant kept asking, "You gonna give it to me, Bria?" When the victim came to the car, she gave Ms. Melissa Isaac her bank card and said the Defendant was upset because the victim had been paid and would not give him the check. After the victim gave her bank card to Ms. Melissa Isaac, the Defendant stated, "Miss Lisa, I'm going to kill your daughter." The Defendant made a gesture with his hands and said, "Pow," the sound of a gun. Ms. Melissa Isaac responded, "Josh, you're not going to do anything to my daughter. 'Cause what [do] you think I'm going to do?" Ms. Melissa Isaac did not believe the Defendant, so she did not take any action.

Ms. Melissa Isaac stated that she and Ms. Wilkins drove the victim back to her apartment so that she could change for her second job. When the victim got out of the car to go into her apartment, the Defendant continued to walk directly behind her. At one point, while the Defendant was standing behind the vehicle, he made a hand gesture and stated, "I'm going to kill you, Bria. I'm going to kill you." The victim wanted to call the police to get the Defendant out of her apartment. However, Ms. Melissa Isaac told her to wait until her shift at her second job was over. Ms. Melissa Isaac explained that she did not want the victim to be late for work because she had been working at Rose's for only one or two weeks.

On cross-examination, Ms. Melissa Isaac testified that the victim was working two jobs in an effort to save enough money to leave the Defendant. Ms. Melissa Isaac stated

that during the course of their ten-year relationship, the victim had tried to leave the Defendant more than twenty times. However, the Defendant would stalk the victim, show up at her job, and call her constantly.

Ms. Wilkins also testified regarding the incident that occurred on October 12, 2016. She stated that when she and Ms. Melissa Isaac arrived at Captain D's after first going to the victim's apartment, the Defendant was standing outside the drive-through window and trying to get the victim's attention. The Defendant then entered the restaurant, and he and the victim soon came outside. Before the victim could enter the vehicle, the Defendant stood in front of her. When the victim entered the vehicle, she said that the Defendant had been asking for her money card because she had just gotten paid. The victim said she needed to pay bills and gave the card to Ms. Melissa Isaac. The victim opened the vehicle's door and said, "I'm not giving you my card." The Defendant asked, "Why?" The victim then instructed Ms. Wilkins to drive to the victim's apartment quickly so that she could lock the Defendant out of the apartment. The Defendant began beating on the vehicle's window and said, "Bria, you think you going to leave me? You crazy." The Defendant then ran toward the victim's apartment.

Ms. Wilkins testified that when they arrived at the apartment complex, the Defendant was running up the stairs toward the victim's apartment. The Defendant was directly behind the victim when she unlocked the door to the apartment, and she was unable to lock him out. When the victim was unlocking the door, the Defendant said, "Miss Lisa, I'm going to kill your daughter." The Defendant lifted up his shirt, and Ms. Wilkins saw a black object around the top of his pants. When the victim returned to the vehicle, Ms. Wilkins asked the victim whether the Defendant had a gun, and the victim said he did not. As they were driving away, the Defendant called the victim "stupid" and said Ms. Melissa Isaac and Ms. Wilkins only came to get the victim because the victim had gotten paid. The victim became angry and asked Ms. Wilkins to stop so the victim could call the police. Ms. Wilkins told the victim that the victim needed to get to her job because she had just been hired and did not need to be late. The victim stated that she planned to make the Defendant leave her apartment. Ms. Wilkins stated that as they were driving away, the Defendant made a hand gesture as if he was aiming to shoot the victim. On cross-examination, Ms. Wilkins testified that the black object was near the button of the Defendant's pants and that she was unsure what the object was.

At the conclusion of the hearing, the trial court found that the Defendant's prior acts of violence and threats against the victim were probative to the issues of motive, premeditation, intent, and lack of mistake or accident. The trial court also found that the evidence was probative as contextual background evidence of the relationship between the victim and the Defendant. The trial court found that the following two instances were not established by clear and convincing evidence: (1) the January 9, 2010 incident during

which the Defendant assaulted the victim and fled with some of her belongings as testified to by Officer Ngien and (2) the October 22, 2015 incident during which the Defendant twisted the victim's leg when she refused to purchase beer for him. The trial court found that the remaining incidents had been established by clear and convincing evidence. The trial court also found that the probative value of the evidence was not outweighed by the danger of unfair prejudice. The trial court stated that it would provide a limiting instruction to the jury.

## Trial

In addition to the evidence that the trial court held was admissible regarding the multiple instances of threats and abuse by the Defendant against the victim, the State presented the following evidence at trial.

Ms. Melissa Isaac testified that the victim was twenty-eight years old at the time of her death. During the ten-year relationship between the Defendant and the victim, the Defendant never had steady employment. The victim worked, paid the bills, and cared for the Defendant's two sons from another relationship. Ms. Melissa Isaac stated that the victim attempted to end her relationship with the Defendant on numerous occasions. However, the Defendant stalked the victim, harassed her, and interrupted her workplace until she agreed to allow him to move back in with her. On cross-examination, Ms. Melissa Isaac testified that the victim left the Defendant twenty to thirty times during the course of their relationship. The victim would have the locked changed on her apartment, and the Defendant would break a window to get in the apartment. The victim would stay with family members and the Defendant would come to their homes. At one point, the victim obtained a protective order against the Defendant.

Approximately two weeks prior to the victim's death, Ms. Melissa Isaac spoke to the victim, who was upset and said that she believed the Defendant had a gun in her apartment and that "his mind wasn't strong enough to have a gun." Ms. Melissa Isaac told the victim that she needed to get the gun out of her apartment or call the police. When Ms. Melissa Isaac spoke to the victim later, the victim stated that the Defendant told her that he had given the gun to one of the neighbors. Ms. Melissa Isaac was not certain whether the Defendant actually gave the gun to a neighbor. Ms. Takasha Isaac likewise testified that approximately three months prior to the victim's death, she was talking to the victim over the telephone when the victim began yelling at the Defendant to take his gun out of her apartment. The Defendant later told the victim that he had given the gun to a friend, but Ms. Takasha Isaac was not certain that he did so.

Ms. Wilkins testified to seeing a black object near the Defendant's waistband when he lifted his shirt while threatening the victim on October 12, 2016. On cross-

examination, she stated that she believed the black object that she saw on the Defendant was a gun but she was uncertain. Ms. Wilkins stated that she had seen the Defendant point a gun at the victim on a prior occasion. On redirect examination, Ms. Wilkins testified that the Defendant pointed a gun at the victim during an argument at her aunt's home when the victim was twenty or twenty-one years old.

Ms. Takasha Isaac also testified regarding the victim's plans to leave the Defendant in the days prior to the victim's death. On October 10, 2016, Ms. Takasha Isaac met with the victim during the victim's break at Captain D's during which they discussed the victim leaving the Defendant and the places that the victim could go to get away from the Defendant. The victim also told Ms. Melissa Isaac that she was planning to leave the Defendant as Ms. Melissa Isaac was driving the victim back to her apartment following her shift at Rose's on Wednesday, October 12, 2016, the same day in which the Defendant made multiple threats to kill the victim.

On the evening of October 12th, Mr. Maclin, the victim's supervisor at Captain D's, saw the Defendant standing beside the exit to the parking lot as Mr. Maclin was leaving following his shift. Mr. Maclin was with one of his co-workers, who knew the Defendant. As they were in Mr. Maclin's car waiting for traffic to clear, the co-worker began talking to the Defendant. Mr. Maclin testified that the Defendant looked "crazy, or angry, or mad, or … upset." The Defendant said, "This n***a got me f***ed up. This s**t got me feeling crazy." He then stated, "Wait till they see the devious s**t I do next."

Ms. Melissa Isaac last spoke to the victim over the telephone on Thursday, October 13, 2016, between 9:30 and 10:00 a.m. as the victim was getting ready to go to work at Captain D's. The victim reported for work as scheduled that day. She had a thirty-minute break in the afternoons during which she generally went to her apartment located across the street. The victim clocked out for her break at 2:12 p.m., but she never returned to work, which Mr. Maclin testified was unusual. Due to the Defendant's statements on the previous day, Mr. Maclin was concerned that the Defendant had beaten the victim. Mr. Maclin sent two different employees to the victim's apartment on two different occasions that afternoon, but neither employee was able to get the victim to come to the door.

The State presented evidence that the Defendant was at or near the victim's apartment that day. Mr. Thomas Taylor, a store leader at a Game Stop located approximately sixty yards from the victim's apartment, testified that a man, whom he later identified as the Defendant in a photographic line-up, entered the store at around 10:15 or 10:20 a.m. on October 13th. Mr. Taylor recognized the Defendant as a "quasi-regular" customer. He was wearing a dark blue "hoodie," a black cap with a red bill and

red writing, and blue jeans. He exchanged a video game controller for cash and spoke with Mr. Taylor for ten to fifteen minutes before leaving the store. Mr. Taylor provided police officers with a video surveillance recording of the transaction, which was played at trial. Later that afternoon at approximately 1:40 p.m., Mr. Taylor was using an ATM machine located near the store. After completing his transaction, he looked across at the apartment complex and saw the Defendant standing on the second floor balcony of the complex. The Defendant was wearing the same clothes that he had worn to the store and was smoking a cigarette.

On Friday, October 14th, beginning at approximately 3:00 p.m., the Defendant called Ms. Stacey Carpenter, his former girlfriend, numerous times asking her to come get him. Ms. Carpenter hung up on the Defendant several times because she was arguing with her boyfriend. She finally agreed to meet the Defendant and picked him up at a location near the victim's apartment at 4:00 or 5:00 p.m. She testified that the Defendant did not appear to be angry and "was trying to—he was acting like his normal self."

During the drive, Ms. Carpenter asked the Defendant where the victim was and that the Defendant responded several times, "Don't worry about it." Upon further questioning, the Defendant said he and the victim got into an altercation about a post on Facebook and that the victim told him to gather his belongings and leave her apartment. The Defendant stated that he took a gun from the victim, that they were "tussling," and that the victim hit her head on the bathtub. Ms. Carpenter testified that the Defendant told her that the gun fired but that he did not tell her how the gun was fired, whether the bullet struck anything, or whether the victim was alive or dead. Ms. Carpenter acknowledged that she gave a statement to the police in which she stated that the Defendant told her that the gun fired once and "missed." The Defendant told Ms. Carpenter that he left the gun "[o]n the couch." Ms. Carpenter drove the Defendant to his grandmother's home.

On cross-examination, Ms. Carpenter testified that police officers threatened to charge her with a crime if she refused to give a statement. On redirect examination, Ms. Carpenter stated that she did not know the exact date in October that she picked up the Defendant but that it occurred on a Friday. She acknowledged that she told police officers that she picked the Defendant up on Friday, October 14.

Ms. Melissa Isaac did not hear from the victim on Friday, October 14 or Saturday, October 15. She called the victim on Saturday but was unable to reach her. No one came to the door when Ms. Melissa Isaac went there and knocked; the victim was not at work; and no other family members had heard from the victim. Later that evening, Ms. Melissa Isaac, Ms. Sherry Isaac, and Ms. Takasha Isaac went to the victim's apartment. The front door was locked. The kitchen door was blocked by a dresser with a mirror, but Ms.

Melissa Isaac and Ms. Sherry Isaac were able to open the door slightly and squeeze through the door. Ms. Melissa Isaac saw the victim's foot sticking out of the bathroom and then saw the victim bent over backwards in the bathtub. Someone called 911, and the next thing that Ms. Melissa Isaac recalled was waking up on the ground outside the apartment and learning that the victim had died.

MPD Sergeant Clifton Johnson, the lead investigator in the case, responded to the scene. He observed the victim in the bathroom lying face-up with her upper body and torso in the bathtub and her legs on the floor. Blood was on the floor near the victim's feet. Sergeant Johnson observed a gunshot wound to the victim's chest. He later learned from the medical examiner's office that the victim also had a gunshot wound behind her left ear.

Sergeant Johnson observed a hole through the bathroom door. MPD Officer Sam Blue with the crime scene investigation unit stated that the bullet hole was located approximately three feet, ten inches up from the floor and approximately two feet away from side of the door where the hinges were located. Officer Blue stated that he observed a defect by in the bathroom wall by the basin and that he believed the bullet penetrated through the bathroom door and entered the wall by the basin. Sergeant Johnson testified that he did not observe any defects in the bathroom wall. Officer Blue did not locate any additional rounds that had been fired into the bathroom, and he did not attempt to remove a bullet from the defect he observed in the wall.

Sergeant Johnson and other officers later returned to the scene and collected additional evidence. Crime scene officers collected a Cash Saver plastic bag that was on top of a garbage can, and the plastic bag contained three empty cans of beer, an empty bottle of vodka, receipts from a Rose's, and a receipt from Game Stop dated October 13, 2016. A blue hoodie was on the couch in the living room, and a black baseball cap with "Miami" in red letters was on the bedroom floor. Underneath one of the cushions on the couch was a wallet that contained the Defendant's state identification card and two Visa credit cards with the Defendant's name on them. Sergeant Johnson assigned a task force to locate the Defendant after the victim's body was discovered. The task force was unable to locate the Defendant, and Sergeant Johnson prepared a Crime Stoppers bulletin regarding the Defendant.

On November 14, 2016, Mr. James Isaac, who was the victim's uncle, and other relatives moved the victim's belongings out of her apartment. Mr. Isaac testified that he and another relative flipped over the couch in the living room, and a gun fell out. Mr. Isaac instructed others in the house to not touch the gun, and he called the police. MPD Officer David Payment went to the victim's apartment to collect the gun, which he identified as a Smith and Wesson .38 special revolver. He stated that four spent shell

casings were in the chamber and that two spaces in the chamber were empty. He also stated the last time someone pulled the trigger to the gun, the gun fired into an empty chamber.

Mr. Larry Norman, the victim's neighbor, identified the gun at trial as the same gun he saw in the Defendant's possession on October 5, 2016. He recalled that the paint on the gun was faded and chipped. Mr. Norman returned home from work that day and joined the Defendant, who was sitting outside in a chair. The Defendant stated multiple times, "Show me your gun, and I'll show you mine." He then pulled out a gun, which Mr. Norman described as a "black .38 snub-nose revolver," and put it in Mr. Norman's lap. At one point, the Defendant opened the gun up, and Mr. Norman saw three bullets in the chamber. Mr. Norman handed the gun back to the Defendant, who put it under his leg. The Defendant then went into the victim's apartment, leaving the gun in the chair. Mr. Norman testified that he believed the Defendant left the gun because he wanted Mr. Norman to handle it. Mr. Norman believed this was "strange," so he wiped his fingerprints off of the gun.

Shortly prior to that incident, on September 25th or 26th of 2016, Mr. Norman and the Defendant were standing outside on the balcony of the complex and discussing relationships. At one point during the conversation, the Defendant told Mr. Norman that he thought about killing the victim with a knife or a hammer while she was sleeping. Mr. Norman said the Defendant was not laughing when he made the statement and appeared to be serious. The Defendant asked Mr. Norman if any men ever came to the victim's apartment, and Mr. Norman told him that he only saw family members there. The Defendant responded, "For all I know, you could be messing with her." Mr. Norman denied the Defendant's accusation and said he did not know the victim's name.

On December 4, 2016, Sergeant Johnson interviewed Ms. Carpenter and obtained an arrest warrant for the Defendant as a result. Officers arrested the Defendant in a home in Stanton, Tennessee. The Defendant did not ask officers why he was being arrested at the time of his arrest. He waived his rights and agreed to speak to Sergeant Johnson and Sergeant Perry Kelley. They asked the Defendant about the victim, whom the Defendant identified as a girlfriend he "used to know." He said he had not seen the victim since October. He stated that a friend named "T" drove him to Stanton to see his brother and that the Defendant liked it there and decided to stay. The Defendant refused to identify "T's" identity. When the officers informed the Defendant of the victim's death, the Defendant began crying loudly while covering his face. The Defendant asked how the victim had died; the officers informed him that the victim was shot; and the Defendant denied any involvement in the victim's death. He maintained that he was in Stanton when the victim was shot. He stated that his brother drove him from his grandmother's

- 13 -

home to Stanton explained that he lied to the officers about "T" in an effort to protect his brother.

Sergeant Johnson testified that when he confronted the Defendant about a witness who saw the Defendant on the balcony of the victim's apartment around the time of her death, the Defendant became quiet, had a "faraway look in his eyes," and agreed to tell the officers what had occurred. He stated that the gun was on the bed when the victim came home, that the victim grabbed the gun, that he knew the victim would throw the gun out of the apartment, and that he tried to take it away from her. He stated that they struggled over the gun, that the gun discharged, and that he left the apartment. He maintained that he did not know how the victim was shot. He agreed that the victim might have been behind the bathroom door when she was shot because they were struggling between the bedroom and the doorway of the bathroom.

The Defendant demonstrated how he and the victim struggled over the gun. He stated that the gun was fired by his head, that they continued struggling, that he pulled away, that the gun was fired again, that the victim fell back into the bathtub, and that he threw the gun on the couch and left. He said he left the apartment because he was afraid. The officers took a break in order to arrange to record the Defendant's demonstration of the struggle. Once they returned, the Defendant ended the interview and requested an attorney.

Dr. Marco Ross, the Interim Chief Medical Examiner and a forensic pathologist at the West Tennessee Regional Forensic Center, was accepted by the trial court as an expert in forensic pathology. The autopsy of the victim was performed by Dr. Zachary O'Neil, who had since left the forensic center and moved to another state. Dr. Ross reviewed the victim's file and testified regarding her autopsy. He stated that the cause of the victim's death was gunshot wounds to the head and chest and that her manner of death was homicide.

Dr. Ross testified that the victim had an entry gunshot wound behind her left ear and no exit wound. The bullet passed along the edge of the victim ear, creating a laceration on the back side of her ear before entering the left side of her head. The bullet traveled back-to-front, left-to-right, and downward. The bullet penetrated the skull underneath the left temporal lobe of the brain, resulting in subarchnoid hemorrhaging and bruising of the brain. The victim sustained another gunshot wound to her chest that entered the left upper portion of her chest and traveled left to right and downward. The bullet went through the victim's left lung, heart, and right lung and ended up in the tissues in the lower right portion of her chest. The victim did not have any exit wounds, and both bullets were recovered in her body. Dr. Ross was unable to determine which wound that the victim received first and said that either shot could have been fatal. He

said the victim could have had some degree of physical activity after receiving either shot.

Dr. Ross noted that tiny abrasions of "somewhat irregular configurations of varying sizes" were in front of and behind the victim's ear. He testified that based upon their distribution around the entrance wound, the abrasions were consistent with pseudo-stippling, which typically result when a bullet passes through an intermediate target and the particles from the intermediate target impact the skin's surface. He stated that pseudo-stippling around the victim's head wound was consistent with the bullet passing through a wooden door and the wood from the door hitting her face. He also stated that a wood splinter on the victim's clothing near her torso was consistent with the bullet traveling through the door. Dr. Ross noted stippling on the victim's chin that was more uniform in size. He testified that the stippling could be gunpowder stippling but that because the "spread" of the stippling was somewhat irregular, it could be pseudo-stippling. He stated that the stippling could be associated with the gunshot wound to the chest and that such stippling indicated that the gun was fired "a little bit farther out."

Dr. Ross testified that when the investigators arrived, rigor mortis on the victim was beginning to fade, which generally occurred within twenty-four to thirty-six hours of death. He noted that the temperature of the room where the victim was found was seventy degrees. He stated that if the victim was found on Saturday and went missing between 2:15 p.m. on Thursday and 5:00 p.m. on Friday, his findings were consistent with the victim's death occurred sometime during that timeframe. On cross-examination, Dr. Ross testified that he did not believe that the victim's death was immediate upon receiving the gunshot wounds because there was bleeding in her chest cavity, which would have taken a few minutes to occur.

Special Agent Kasia Lynch with the Firearm Identification Unit of the Tennessee Bureau of Investigation was accepted by the trial court as an expert in firearms identification. She tested the .38 special revolver found in the victim's apartment, the four cartridge casings in the revolver, and the two bullets recovered from the victim's body and determined that all four cartridge casings and both bullets were fired from the revolver. She noted that the revolver could be fired through a single action where the shooter pulls the hammer back and allows it to sit at the rear until the shooter pulls the trigger to release the hammer or through a double action where the shooter pulls the trigger which both pulls the hammer back and then releases the hammer. She testified that firing the revolver through single action required four and one-half pounds of pressure on the trigger, which was like the pressure required to use a bottle of glass cleaner, while firing the revolver through double action required approximately thirteen and seven-eighths pounds of pressure on the trigger, which was like opening a car door with one finger. She stated that because the safety on the revolver was working properly

and due to the amount of pressure required to fire the revolver, it would not have fired unless the trigger was pulled "to the rear" of the revolver.

MPD Lieutenant Anthony Mullins was accepted by the trial court as an expert of the field of bloodstain pattern analysis. He testified that blood spatter on the bathroom floor near the victim's feet was a drip blood stain that was consistent with the victim being shot in the head and leaning down. He stated that the victim was likely upright and directly over the stain when she was shot. On cross-examination, Lieutenant Mullins testified that he could not determine the victim's exact position when she was shot but that he concluded that the victim was over the blood stain when the blood stain was created. He testified, "That's the source of the blood, her standing over where that stain is and dripping straight down."

The jury convicted the Defendant of first degree premeditated murder, and the trial court imposed a sentence of life imprisonment. The Defendant filed a motion for new trial, which the trial court denied. He then filed a notice of appeal.

## ANALYSIS

The Defendant contends that the trial court erred in admitting evidence of his prior threats and abuse of the victim pursuant to Tennessee Rule of Evidence 404(b). The Defendant asserts that the trial court erred in finding that the evidence was probative to establish a contextual background of the relationship and in finding that the probative value of the evidence is not outweighed by the danger of unfair prejudice. The State responds that the trial court properly exercised its discretion in admitting the evidence. We agree with the State.

"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." Tenn. R. Evid. 404(b). Rule 404(b) has been described as a rule of exclusion rather than inclusion. *State v. Jones*, 450 S.W.3d 866, 891 (Tenn. 2014). "Trial courts have been encouraged to take a 'restrictive approach of [Rule] 404(b) ... because "other act" evidence carries a significant potential for unfairly influencing a jury.'" *Id.* (quoting *State v. Dotson*, 254 S.W.3d 378, 387 (Tenn. 2008)).

Evidence of other acts may be admissible for other non-propensity purposes, such as "to establish motive, intent, identity, absence of mistake, or common plan or scheme," or contextual background. *State v. Little*, 402 S.W.3d 202, 210 (Tenn. 2013); *see* Tenn. R. Evid. 404(b), Advisory Comm'n Cmts. Evidence may be admitted for these purposes if the following requirements have been met:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b).

If the trial court has substantially complied with the procedure mandated by Rule 404(b), a trial court's decision to admit or exclude evidence pursuant to Rule 404(b) is reviewed under an abuse of discretion standard. *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997). A trial court abuses its discretion when "'it applies an incorrect legal standard or its decision is illogical or unreasonable, is based on a clearly erroneous assessment of the evidence, or utilizes reasoning that results in injustice to the complaining party.'" *Jones*, 450 S.W.3d at 892 (quoting *State v. Adams*, 405 S.W.3d 641, 660 (Tenn. 2013)). If the trial court has failed to substantially comply with the procedural mandates of Rule 404(b), our standard of review is de novo. *State v. Mallard*, 40 S.W.3d 473, 486 n.13 (Tenn. 2001) (citing *DuBose*, 953 S.W.2d at 652-53).

The trial court held an evidentiary hearing outside the jury's presence and found that the evidence was admissible for various non-propensity purposes, that the bad acts had been established by clear and convincing evidence, and that the probative value of the evidence was not outweighed by the danger of unfair prejudice. The trial court substantially complied with the procedural mandates of Rule 404(b). Therefore, our standard of review is abuse of discretion.

The trial court made extensive findings that the evidence of the Defendant's prior threats and abuse against the victim was probative of multiple material issues: intent, premeditation, motive, lack of mistake or accident, and contextual background. The Defendant only challenges the trial court's finding of admissibility of the evidence as probative of contextual background. Had the trial court found that the evidence was probative as to only contextual background, the Defendant's argument may well be valid. However, the trial court found that the evidence was probative to other material issues, which the Defendant does not challenge on appeal. *See State v. Smith*, 868 S.W.2d 561, 574 (Tenn. 1993) (holding that "[v]iolent acts indicating the relationship between the

- 17 -

victim of a violent crime and the defendant prior to the commission of the offense are relevant to show defendant's hostility toward the victim, malice, intent, and a settled purpose to harm the victim"); *see also State v. Gilley*, 297 S.W.3d 739, 758 (Tenn. Crim. App. 2008); *State v. Turnbill*, 640 S.W.2d 40, 46-47 (Tenn. Crim. App. 1982). Because the Defendant's challenge to the admissibility of the evidence on the basis of contextual background does not negate the trial court's finding that such evidence was probative to other material issues, we deem it unnecessary to address the Defendant's argument.

The Defendant does not challenge the trial court's finding that the prior threats and acts of violence against the evidence were established by clear and convincing evidence. Rather, he contends that the probative value of the evidence is outweighed by the danger of unfair prejudice. His argument is based upon the trial court's findings that the evidence was probative of the contextual background of the relationship between the victim and the Defendant. The Defendant does not address the probative value of the evidence as it relates to the issues of premeditation, intent, and lack of mistake or accident. The Defendant attempted to show that the shooting was accidental, and evidence of his history of abusing the victim was probative to establish that the shooting was not accidental but was premeditated and intentional. Furthermore, the trial court gave the jurors a limiting instruction regarding their treatment of the evidence. *See Gilley*, 297 S.W.3d at 758-59; *see also State v. Jordan*, 116 S.W.3d 8, 18 (Tenn. Crim. App. 2003). Accordingly, the trial court properly determined that the probative value of the evidence was not outweighed by the danger of unfair prejudice and properly exercised its discretion in admitting the evidence.

## CONCLUSION

Upon reviewing the record, the parties' briefs, and the applicable law, we affirm the judgment of the trial court.

_____
JOHN EVERETT WILLIAMS, PRESIDING JUDGE