IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs June 29, 2021

## STATE OF TENNESSEE v. ZACARIAS SALAS-RUFINO[1]

**Appeal from the Criminal Court for Hamilton County**
**No. 302229     Barry A. Steelman, Judge**

---

### No. E2020-00986-CCA-R3-CD

---

Aggrieved of his Hamilton County Criminal Court jury conviction of second degree murder, the defendant, Zacarias Salas-Rufino, appeals, challenging the admission of certain telephone calls and the testimony of the medical examiner on the issue of "excited delirium." Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN, and ROBERT L. HOLLOWAY, JR., JJ., joined.

Hannah C. Stokes, Chattanooga, Tennessee (on appeal); and Erinn O'Leary, Assistant District Public Defender (at trial), for appellant, Zacarias Salas-Rufino.

Herbert H. Slatery III, Attorney General and Reporter; Samantha L. Simpson, Assistant Attorney General; Neal S. Pinkston, District Attorney General; and Cameron Williams and Brian C. Bush, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

The Hamilton County Grand Jury charged the defendant with one count of second degree murder for the death of his estranged wife, Yessica Ruiz, on September 26, 2016.[2]

The evidence adduced at the defendant's May 2019 trial established that four 9-1-1 calls came from 3207 Navajo Drive in Chattanooga on September 26, 2016.

---

[1]     The record indicates that the defendant was also known as Carlos Delposo.
[2]     Although the offense giving rise to the charge in this case occurred on September 26, 2016, the victim did not succumb to her injuries until October 1, 2016. For the sake of clarity, we will use the offense date of September 26, 2016.

Emergency medical personnel responded to the first call, which had been placed by a man who identified himself as Carlos, at 6:15 a.m. Emergency personnel "made contact with an individual. . . . that was having what they told us was chest pains." The individual pointed at his chest and indicated "pressure," but instead of going to the waiting ambulance, the man turned around, said something in Spanish, and then drove away in a small pickup truck. Paramedics described the man's demeanor as "uncooperative and agitated."

Emergency medical personnel responded to the second call at 6:50 a.m. and found "a male, a female, and . . . two kids" "[r]ight inside the door." The female spoke only Spanish while the man spoke a mix of English and Spanish. The man, who was sitting on the couch, told emergency personnel that he did not need an ambulance. Paramedics performed a "quick assessment" by checking his pulse and respirations and found that "[h]is pulse was not beating fast." The man appeared "aggravated at" the presence of emergency personnel but did not appear to be under the influence. The paramedics left at 6:59 a.m.

Sometime between 6:55 and 7:15 a.m., Navajo Drive resident Sharon Brown heard "screaming and yelling and arguing" from her bathroom window. Ms. Brown glanced out the window and saw the victim and the defendant, whom she knew only as "Carlos," arguing. The argument was in Spanish, so Ms. Brown, a native English speaker, could not understand what they were saying. Eventually, the sound of the argument, which had gotten significantly louder, traveled to the side of the building. Ms. Brown opened the door, and "it got louder." Ms. Brown testified that she had "never heard wails or cries like that, and screaming and yelling" and that it sounded as though the victim "was fighting for her life."

When "it went quiet," Ms. Brown went outside and saw the victim "come out from around the wall," "walk[] a little way[]," and then fall to the ground "at that rock wall. She didn't make it far." The victim rolled over, and Ms. Brown "saw the blood coming down her leg," so she called 9-1-1. The victim crawled to the middle of the yard, lay "on her side for a few seconds, and then she rolled over on her back" before calling out, "'Help me.'" Ms. Brown did not see the defendant but heard him "over there" "[b]eside the apartment" "doing something loud." At some point, the couple's children came outside, and Ms. Brown took them into her apartment. The children "were very upset." Ms. Brown saw no one other than the defendant and the victim from the time she first heard them arguing to the time the police arrived.

Sometime in the early morning hours of September 26, 2016, the defendant knocked on the door of Tolbert Dye, who lived in the same building as the defendant, and asked to come inside and sit on the couch but did not mention any health problems. When Mr. Dye told the defendant that he could not come inside because Mr. Dye's seven

Chihuahuas were out, the defendant, who was behaving "[n]ormal like," "walk[ed] back down the steps, back down to his apartment." A short time later, Mr. Dye was awakened by "[a] big old boom" coming from "[s]omewhere right there in the hallway" outside the apartment shared by the defendant and the victim. He then "heard the door shut. I could hear [the victim] crying" "[o]h, no, Carlos, oh, no." Mr. Dye went back to bed because he did not want to "get in no domestic violence," and when he woke up again, he saw "some blue lights and" looked outside to see the victim "lying right there in front of this truck where the tree is." He heard the defendant "hollering 'Jessica, Jessica,'" and "Help me."

Chattanooga Police Department ("CPD") Officer Matthew Ballinger responded to Ms. Brown's 9-1-1 call. When he arrived at 3207 Navajo Drive "around 7 o'clock in the morning," he found "a female lying on the ground covered in blood and there were two children sitting near her." Officer Ballinger "tried to talk to her for a second. . . . It seemed like she was trying to mumble something, but I couldn't tell what it was." He did not stay with the victim "very long, because I had to jump down back onto Navajo Drive because I heard screaming coming from Navajo Drive." As Officer Ballinger got closer to the sound of the screams, he saw the defendant "in the street" "running towards me at full speed." Officer Ballinger drew his weapon and ordered the defendant to the ground. The defendant complied. The defendant, who "seemed very excited," said "policia" and "help." Officer Ballinger handcuffed the defendant and seated him on the curb because he was covered in blood and had a small injury to his leg. The defendant continued "spontaneously uttering things" and "yelling" "police" and "help" as he sat on the curb. His demeanor alternated between "calm to screaming, calm to screaming," and he "slumped over at one point."

The defendant was transported by ambulance to Parkridge Hospital for treatment of the injury to his leg. Although the defendant had a slightly elevated blood pressure, elevated blood sugar, elevated respiratory rate, elevated heart rate, and was sweating profusely, none of these symptoms was dangerous or indeed serious enough to warrant treatment. The defendant was oriented to time and place and was able to communicate his name, date of birth, and address to paramedics. Despite this, the defendant's behavior was "paranoid and bizarre." "[O]ne minute he's screaming and yelling; the next, he is calm and cooperative, then he accuses people of killing him, and he's afraid of lights." Paramedics indicated on a report that "'excited delirium is a possibility'" even though "[t]he fact that he was sometimes lucid and sometimes erratic . . . indicated . . . that excited delirium probably wasn't the case" because "sometimes some of the responses to patients who are suffering from excited delirium by emergency responders can be the wrong ones."

Doctor Paul Bing treated the defendant at Parkridge Hospital and, following an observation of the defendant that lasted only minutes, diagnosed the defendant with

"cocaine and methamphetamine delirium," which he described as "a state of intoxication to the extent that you become delirious; in other words, . . . a state of delirium is marked by confusion, not being in tune with reality, not being aware of really your surroundings and what's going on, often with agitation." Doctor Bing gave the defendant "medicine to calm him down," and the defendant "settled down" and "might have even gone to sleep." Doctor Bing checked on the defendant after "a few hours" and stitched the cut in the defendant's leg. Blood tests indicated that the defendant had used cocaine and methamphetamine but not alcohol.

Emergency personnel transported the victim to Erlanger Hospital, where she remained until her death on October 1, 2016. An autopsy established that the cause of her death was multiple stab wounds and the manner of death was homicide. A total of 27 stab wounds covered the victim from head to toe and were "mostly concentrated along the left arm, the chest, and the right side of her back." She also suffered stab wounds to the scalp, mouth, and neck. Only two of the wounds "actually hit vital structures," and the remainder "are basically going into subcutaneous fat and muscle and soft tissue." One of the fatal wounds was a chest wound that "actually penetrate[d] into the chest cavity and hit[] the left lung . . . , causing hemorrhage into the chest cavity." The other was a wound to the victim's left thigh that "hit the femoral artery," causing "a lot of hemorrhage." The combination of these two wounds "plus the other wounds -- which are also going to bleed, although not profusely -- results in enough blood loss that even though these injuries are repaired surgically, by that time she had not had enough blood going to her brain and suffered brain death, basically, or anoxic brain injury."

The Tennessee Bureau of Investigation conducted forensic testing on a kitchen knife recovered from the scene near where the victim eventually fell to the ground and the clothing the defendant was wearing at the time of her death. Forensic testing established that the blood on the knife blade came from the victim. The DNA profile obtained from the knife handle indicated three people: the victim, an unknown male, and a third person. The defendant's DNA was not present on the knife in an amount detectable via forensic testing. Blood on the defendant's shirt came from both the victim and the defendant.

Based on the evidence presented at trial, the jury convicted the defendant as charged of second degree murder, and, following a sentencing hearing, the trial court imposed a sentence of 25 years' incarceration, to be served at 100 percent by operation of law. The defendant filed a timely but unsuccessful motion for new trial followed by a timely notice of appeal.

In this appeal, the defendant contends that the trial court erred by admitting into evidence three 9-1-1 calls placed by the victim in April and May 2016 and a telephone

conversation between the defendant and his employer following the defendant's arrest and by permitting the medical examiner to render an opinion on whether the defendant had suffered from "excited delirium" at the time of the stabbing.

## I. 9-1-1 Calls

Prior to trial, the defendant moved the trial court to exclude from evidence three 9-1-1 calls placed by the victim in April and May 2016 as inadmissible hearsay and impermissible propensity evidence. The State argued that the calls were admissible via the excited utterance exception to the hearsay rule to establish the defendant's identity as the perpetrator, his motive for the killing, the nature of the relationship between the defendant and the victim, and the defendant's settled intent to harm the victim.

At the hearing on the defendant's motion in limine, CPD Officer Calvin Cooper testified that he had responded to "more than one call" placed from the 3207 Navajo Drive residence of a "[f]emale by the name of Yessica Ruiz and a person we were told was Delposo." He identified the defendant as the person he knew as "Delposo." It was Officer Cooper's understanding that the defendant and the victim were "boyfriend and girlfriend" and that they shared two young children. On April 12, 2016, Officer Cooper responded to "a domestic assault call" placed at approximately "4 or 5 in the morning." The defendant told Officer Cooper that the victim "had just returned home by means of another man, and she was intoxicated, and she was more of the one causing the disorder." Officer Cooper recalled that the defendant spoke enough English to communicate with him but that the victim spoke very little English, "enough just to . . . articulate with her hand motions that she'd been assaulted in the face." She indicated with "a closed fist towards her face." Officer Cooper also used "a cellphone app called Google Translate" when speaking to the victim. Officer Cooper "recall[ed] a mark on her face but I don't recall where it was exactly." The victim told Officer Cooper that the defendant had assaulted her, but the defendant "stated that she came home in that state." Given that the defendant and the victim provided "conflicting statements," Officer Cooper "just transported him to a different location" because the victim indicated that she did not have anywhere else to go.

Officer Cooper responded to another domestic violence call at 3207 Navajo Drive on May 23, 2016, at "1 or 2 in the morning." When he arrived, he found the defendant and the victim engaged in an argument. "[S]he was saying he wouldn't leave her alone, and he would state that she wasn't leaving him alone." Officer Cooper "advised both parties to go to separate rooms. [The defendant] said he was going to sleep on the couch and she said she was going to sleep in the bedroom." Officer Cooper "advised her to lock the door" and to call back "if there were any problems." He recalled that "both parties had been intoxicated." Officer Cooper responded to a second call later that same morning and found "[p]retty much the same thing. They were just at it." The victim told

-5-

him that the defendant "kept knocking at her door."  Again, Officer Cooper asked the parties if they had somewhere else to go, and the victim said she did not while the defendant indicated the same address where Officer Cooper had taken him in April.

During cross-examination, Officer Cooper acknowledged that he did not make any arrests in relation to the April call because he could not determine who was the primary aggressor and could not establish that the defendant had actually caused the victim's injury.  Officer Cooper said that the victim was obviously intoxicated on those occasions that he responded to 3207 Navajo Drive and that the defendant did not appear to be intoxicated despite saying that he had consumed "one or two beers."  In any event, the defendant "wasn't highly intoxicated to the level that she was."

The defendant argued that none of the calls qualified as an excited utterance. He noted that the victim did not allege any physical altercation in the first May 23 call and that, although she alleged physical contact in the other calls, Officer Cooper's testimony negated her allegations.  He argued that the victim's allegations in the call were "not clear and convincing proof of an actual event, and that the prejudicial effect of this would strongly outweigh the probative value."  The State argued that the proof clearly showed a startling event and argued that any evidence that someone other than the defendant injured the victim went to the weight of the evidence and not its admissibility.  The State argued that the calls evinced the defendant's "intent to harm the victim" and that evidence of the defendant's intent was particularly relevant given that the defendant had indicated that he would rely, at least in part, on a voluntary intoxication defense.  The prosecutor candidly acknowledged that "[i]f the defense of intoxication or delirium is not asserted, then I don't know that the probative value outweighs the danger of unfair prejudice."  The defendant said that the purpose of presenting such a defense would be to show that the defendant was not able to form the requisite mental state for either first or second degree murder.  The prosecutor also argued that the calls were probative of motive, and, in turn, identity and that they were even more crucial to the State's case because the trial court had suppressed the defendant's statement to the police.

Questions concerning evidentiary relevance rest within the sound discretion of the trial court, and this court will not interfere with the exercise of this discretion in the absence of a clear abuse appearing on the face of the record.  *See State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997); *State v. Van Tran*, 864 S.W.2d 465, 477 (Tenn. 1993); *State v. Harris*, 839 S.W.2d 54, 73 (Tenn. 1992).  An abuse of discretion occurs when the trial court applies an incorrect legal standard or reaches a conclusion that is "illogical or unreasonable and causes an injustice to the party complaining." *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006) (citing *Howell v. State*, 185 S.W.3d 319, 337 (Tenn. 2006)).

Relevant evidence is "evidence having any tendency to make the existence

of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. "Evidence which is not relevant is not admissible," Tenn. R. Evid. 402, and even if evidence is deemed relevant, it may be still be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence," Tenn. R. Evid. 403.

Generally speaking, "[e]vidence of a person's character or trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion." Tenn. R. Evid. 404(a). This rule is subject to certain exceptions, however, including "evidence of a pertinent trait of character offered by an accused or by the prosecution to rebut the same." Tenn. R. Evid. 404(a)(1). In addition, "[e]vidence of other crimes, wrongs, or acts" may be admissible for "other purposes," such as proving identity, criminal intent, or rebuttal of accident or mistake. Tenn. R. Evid. 404(b); *State v. Thacker*, 164 S.W.3d 208, 239-40 (Tenn. 2005). To admit such evidence, the rule specifies four prerequisites:

> (1) The court upon request must hold a hearing outside the jury's presence;
>
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;
>
> (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and
>
> (4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b).

Tennessee courts have accepted the use of evidence of a homicide defendant's threats or prior violent acts directed toward the homicide victim as a means of allowing the State the opportunity to establish intent, theorizing that such evidence is probative of the defendant's mens rea at the time of the homicide because it reveals a "settled purpose" to harm the victim. *See State v. Smith*, 868 S.W.2d 561, 574 (Tenn. 1993); *see also State v. Turnbill*, 640 S.W.2d 40, 46-47 (Tenn. Crim. App. 1982). Specifically, our supreme court has ruled that "[v]iolent acts indicating the relationship

between the victim of a violent crime and the defendant prior to the commission of the offense are relevant to show defendant's hostility toward the victim, malice, intent, and a settled purpose to harm the victim." *Id.*

On appeal, the defendant argues that the 9-1-1 calls do not fall within the *Smith* rule because the State failed to present clear and convincing evidence that the defendant had committed any prior "violent acts" against the victim. Noting Officer Cooper's testimony that it was unclear that the defendant had actually assaulted the victim and that the calls were more in the nature of "verbal disorders," the defendant asserts that the trial court erred by admitting them. The defendant's assertion that the calls did not constitute evidence of other bad acts arguably cuts against his assertion that evidence rule 404(b) barred their admission. In the calls, the victim claimed that the defendant wanted to hit her and kill her, that he had hit her before, and that she was afraid of him. Officer Cooper testified, however, that he saw no evidence from which he could conclude that the defendant had struck the victim and that the incidents were arguments. In our view, even if the evidence did not clearly and convincingly establish that the defendant committed a "violent act" against the victim, it was probative of the querulous and pugnacious nature of their relationship and of the defendant's hostility toward the victim, and, accordingly, relevant to establish his motive for harming the victim and, by extension, his identity as the perpetrator. Consequently, the trial court did not err by admitting this evidence. Additionally, the trial court specifically instructed the jury that if it concluded "that the defendant has committed one or more bad acts other than those for which he is on trial, you may not consider that evidence to prove his disposition to commit crimes such as those for which he is on trial" but could consider such evidence only for the limited purpose of "the nature of the relationship, identity, motive, intent." Moreover, we easily conclude that, considering the record as a whole, any error occasioned by the admission of this evidence was harmless.

## II. Jail Calls

The defendant next asserts that the trial court erred by admitting into evidence the recording of the defendant's conversations with his employer following his arrest, arguing only that the probative value of the evidence was substantially outweighed by the danger of unfair prejudice occasioned by its admission.

Prior to trial, the defendant moved the trial court to exclude the recordings on grounds that the statements made by the defendant's employer constituted inadmissible hearsay and that the defendant's statements, though admissible, were substantially more prejudicial than probative. The trial court found that the employer's statements were not offered for their truth and, thus, not hearsay and that the probative value of the recordings outweighed the danger of unfair prejudice.

The trial court may exclude even relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. We review the trial court's decision to admit or exclude evidence pursuant to evidence rule 403 for an abuse of discretion.

In the calls, the defendant discussed the charges against him related to the victim's death. It would be difficult to fathom a situation when a homicide defendant's discussion of the charges against him and his relationship with the victim would not be at least marginally relevant at a subsequent homicide trial. That being said, the defendant's statements at issue are not particularly probative in that he did not actually describe the circumstances of the offense. In the same way, they are not particularly prejudicial. Indeed, the defendant's assertions in the call that the victim had been having "a lot of problem with somebody else" tended to support his defense that someone else had killed the victim. Additionally, the defendant's employer testified on behalf of the defendant that the references to domestic violence were actually meant to be a joke. Under these circumstances, we cannot say that the trial court erred by admitting the jail calls.

### III. Excited Delirium

Finally, the defendant claims that the trial court erred by permitting the medical examiner to provide an expert opinion on the issue whether the defendant was suffering from excited delirium at the time of the stabbing. He argues that the trial court should have excluded the testimony because the State failed to comply with Tennessee Rule of Criminal Procedure 12.2, which requires pretrial disclosure of expert testimony about the defendant's mental disease, defect, or condition "bearing on the issue of . . . guilt." The State asserts that it is not bound by the pretrial notice provision of Rule 12.2 and that the defendant opened the door to the evidence by questioning the medical examiner about the effects of cocaine in general and about cocaine induced excited delirium specifically.

The State did not ask a single question about the effects occasioned by the ingestion of certain drugs or about excited delirium during the direct examination of the medical examiner, Doctor Steven Cogswell. During cross-examination, the defendant asked Doctor Cogswell how cocaine would affect the human body generally, and he replied that both cocaine and methamphetamine were central nervous system stimulants while alcohol was a depressant. Doctor Cogswell agreed that both cocaine and methamphetamine "have a very individualized response" and that, for that reason, "we can't take a particular dose and say this is what this person would have done." Doctor

Cogswell agreed that cocaine could cause "delirium," and, when prompted, explained, "[D]elirium, technically, is an altered mental state. So there is such a thing as an excited delirium that [is] frequently associated with cocaine and stimulant abuse . . . ." He said that any person who ingested cocaine would "get an altered mental state" and would "by definition . . . have achieved a state of delirium." He added, "Now, they do not get an excited delirium because an excited delirium has nearly a hundred percent mortality rate, so obviously most folks who do cocaine don't die from it." Doctor Cogswell testified that a person suffering from delirium due to stimulant use "might become irritable, you might become delusional to the point of seeing things that aren't there, and there's a fairly broad spectrum." He added, "Physiologically, that is, with the body itself, stimulant drugs tend to increase the heart rate, they cause sweating, they may cause blood pressure to go up, respiration to go up or become more rapid." Doctor Cogswell agreed that two different people could have disparate reactions "from the same quantity of drugs or the same amount, the actual same specimen of drugs." He also agreed that, because cocaine is an unregulated street drug, "you don't really know what's in it."

During redirect examination by the State, Doctor Cogswell testified without objection that excited delirium syndrome was "initially called acute exhaustive mania, and it was seen in mental institutions with schizophrenic patients." He said that, following the development of drugs to treat such patients, the syndrome "basically went away." Excited delirium experienced a resurgence among cocaine users in Miami in the 1980's who had "a very different kind of reaction to the drug than the norm." Doctor Cogswell explained that such "people become extremely paranoid and extremely violent," adding,

> These are the ones you read about or see on TV where they take off all their clothes, they run out in the street, they're smashing windows, attacking cars, basically behaving out of control. So, of course, police are called and they attempt to restrain this person and then they die.

In "excited delirium cases, their brain is driving that, because the brain is constantly being bombarded with this aberrant pathway thing that's going on that results in their heart having [t]his potassium that's way too low to keep it beating regularly and their hearts just quit." Doctor Cogswell estimated that "the fatality rate for excited delirium syndrome is somewhere over 90 percent. These people are very very hard to save." Doctor Cogswell distinguished excited delirium from delirium in general, explaining that "[e]xcited delirium is a medical emergency that has a very very high mortality. Delirium is just something that we've all experienced" maybe due to alcohol consumption or high fever. Doctor Cogswell said that those suffering from excited delirium "tend to have a really high body core temperature . . . that may be the reason for tearing off their clothes," that they also tend to be "aggressive towards glass and mirrors," and that "[t]hey're a lot stronger than you would

-10-

expect." He reiterated that "a regular delirium is something that is just an altered mental state of either perception or the amount of stimulation . . . your level of being obtunded or essentially semi-comatose or very agitated" and emphasized that "you can have an agitated delirium, but that's not the same thing as an excited delirium. That's just an agitation." Doctor Cogswell said that delirium has "a pretty broad spectrum" with excited delirium on the high end. To determine the degree of delirium along that spectrum, "[y]ou'd have to look at the clinical picture, what the patient is doing" at the time. Doctor Cogswell testified that, in preparation for trial, he had reviewed the defendant's medical records and had listened to a recording of the 9-1-1 calls from September 26, 2016.

At that point, the defendant objected, arguing that he had not opened the door to Doctor Cogswell's giving an opinion about the defendant's degree of delirium by asking questions about the effects of cocaine. Defense counsel said that she had intentionally limited her questioning of Doctor Cogswell to those "along the lines of what the effects might have been on [the victim]" and that she had asked those questions "so that the jury would realize that just because I'm putting on later evidence about him, she didn't necessarily have cocaine delirium. The purpose of me asking those questions was in relation to her, not to him." The court pointed out that the defendant had specifically asked Doctor Cogswell about the potential effects of both the defendant's and the victim's using "the same source of cocaine." Counsel replied that she had done so because she wanted to "put in front of the jury evidence that somebody who has cocaine in their system may not necessarily have cocaine delirium." She also claimed that she was "caught off guard about this because I had absolutely no idea that Dr. Cogswell was looking at [the defendant's] medical records" and claimed that it would be unfair to ask Doctor Cogswell "to elicit an opinion based on partial evidence that was selected by the D.A." The trial court found that the defense had "notice that he's a witness" and

> that the defense has opened the door to this delirium line of questioning because [the State] did not ask a single question about delirium in the direct examination. The defense began to ask about delirium, what delirium was, led the doctor's testimony on cross-examination into that "delirium" means an altered mental status and that all drugs cause an altered mental status, that there is an excited delirium that can be caused by cocaine, that it is a different thing from just a delirium caused by taking drugs in general, the symptoms of an excited delirium, that cocaine can cause delirium, the physical symptoms of excited delirium, a heart rate increase, sweating, respiratory issues, that the vast majority of cocaine on the street is not pure. And the doctor answered in response to your questioning that you really don't know what's in cocaine. I do

-11-

believe that that opens the door . . . .

The court also ruled "that the defense has opened the door such that Doctor Cogswell can testify about things that he observed from the medical records related to [the defendant's] medical condition, about his behavior that was documented." The court also allowed the defendant "to have the benefit of a jury-out hearing" to hear Doctor Cogswell's testimony and "make any further objection that you might have."

Following the jury-out hearing, the trial court confirmed its ruling that the defendant had opened the door to Doctor Cogswell's testimony on this issue. During further redirect examination, Doctor Cogswell testified that one could be in a state of delirium and still understand the nature and consequences of one's actions, saying that the level of understanding would depend "on how deep or wide your delirium is. It could be anywhere from a little delirious to extremely delirious, so in that state, yeah, you could be fairly cognizant." He said that

> there is no laboratory test for the degree of delirium. You have to look at the person and see what they're doing, how they're acting, how they respond to questions, how they respond to what you're attempting to do. You have to basically interview them and see what their connection with reality is, because, after all, that's what the mind-altering drugs are for is to kind of take you a little bit away from reality.

Doctor Cogswell reiterated that he had reviewed the 9-1-1 call from September 26, 2016, the defendant's medical records from his treatment at the emergency room that day, and "a video."[3] Based upon his review, he concluded that the defendant was not in a state of excited delirium on the day of the offense, explaining that the defendant had "multiple episodes of acting out behavior . . . on a baseline of fairly lucid actions, . . . basically doing what he's told to do, go here, sit here, stay here, . . . and responding relatively appropriately to questions, but then having a break where there would be very inappropriate responses."

During further cross-examination by the defendant, Doctor Cogswell conceded that he could have been "a lot more specific and definitive" about the defendant's level of delirium "had I actually interviewed and interacted with him. You know, what you could do secondhand and thirdhand is somewhat limited, but still, in this case, I think there's sufficient data." Doctor Cogswell agreed that the defendant had been diagnosed with "intoxication delirium" and that he had not reviewed the entire case file or interviewed

---

[3] The video reviewed by the doctor was apparently body camera footage of the defendant shortly after his arrest. By agreement of the parties, the video was not introduced into evidence and not more explicitly described by any witness at trial.

any of the witnesses who observed the defendant's behavior. Nevertheless, he maintained that he could not say whether that information would cause him to change his opinion "[w]ithout knowing what that information was." He allowed that "[g]enerally speaking," he would have preferred to have access to all of the potentially relevant material but said that "the relevant information is frequently buried among a thousand pages of unhelpful information, so it becomes a matter of practicality." He explained, "I'm sure that the nuggets of the important information are in there, but I don't know how much unimportant information is with it" and that, for that reason, "I'm sure I probably really don't" need to review all of the information. Doctor Cogswell said that most people die from excited delirium without treatment with "a sedating antipsychotic."

> Tennessee Rule of Criminal Procedure 12.2 provides in pertinent part:
>
> (b) Expert Testimony of Defendant's Mental Condition.
>
> (1) Notice of Expert Testimony. A defendant who intends to introduce expert testimony relating to a mental disease or defect or any other mental condition of the defendant bearing on the issue of his or her guilt shall so notify the district attorney general in writing and file a copy of the notice with the clerk.
>
> (2) Timing. Notice described in Rule 12.2(b)(1) shall be filed within the time provided for the filing of pretrial motions or at such later time as the court may direct. The court may, for cause shown, allow the defendant to file the notice late, grant additional trial-preparation time, or make other appropriate orders.
> . . . .
>
> (d) Failure to Provide Notice of Expert Testimony or to Submit to Mental Examination. If a defendant fails to give notice under Rule 12.2(b) or does not submit to an examination ordered under Rule 12.2(c), the court may exclude the testimony of any expert witness offered by the defendant on the issue of the defendant's mental condition. . . .

Tenn. R. Crim. P. 12.2(b), (d). By their terms, the notice provisions in Rule 12.2 apply only to the defendant. Indeed, the Advisory Commission Comment to the rule specifies that "Rule 12.2(b) imposes a notice requirement *on the defendant* when expert witnesses are to testify as to the defendant's mental state." Tenn. R. Crim. P. 12.2, Advisory Comm'n

-13-

Comment (emphasis added). Accordingly, Rule 12.2 does not avail the defendant of any relief.

Moreover, we agree with the State and the trial court that the defendant opened the door to Doctor Cogswell's testimony. The State did not ask any questions about delirium during direct examination. Instead, the defendant broached the subject first on cross-examination by asking questions about the effects of cocaine, whether the use of cocaine could cause delirium, and about the symptoms of excited delirium. The defendant also asked specifically whether it would have been possible for the defendant and the victim to react differently after having used cocaine from the same source. The defendant did not, at any point, object to Doctor Cogswell's qualification to render an opinion on whether the defendant was suffering from excited delirium at the time of the stabbing but argued only that the doctor had reviewed insufficient information to render such an opinion. In our view, the nature of the information reviewed by the doctor would go to the weight of his opinion and not its admissibility. *See generally Payne v. CSX Transp., Inc.*, 467 S.W.3d 413, 457 (Tenn. 2015) ("So long as a qualified expert can offer an opinion, based upon reliable data, that will substantially assist the trier of fact, the expert's testimony should be permitted.") (citations omitted). Under these circumstances, the trial court did not err by admitting Doctor Cogswell's testimony.

*Conclusion*

Accordingly, we affirm the judgment of the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE